# Puritan Coal Mining Co. v. Pennsylvania R. R. Co., Appellant.

*Corporation—Assignment of stock by shareholders—Reservation of rights owned by corporation—Carriers—Discrimination.*

1. The shareholders of a corporation have not, by mere fact of being shareholders any agency for the corporation, or any authority to act for it; nor can they convey or assign its property, although all unite, unless through formal action of the corporation they have been made its agent to that end.

2. Where an incorporated coal company has brought an action against a railroad company, for unlawful discrimination, and thereafter the three stockholders who own all the stock of the company sell the stock with a reservation to themselves of the right to continue the action against the railroad company, and to appropriate any pecuniary results therefrom to themselves, such sale and reservation does not deprive the company of the right to continue the action.

*Carriers—Railroad companies—Discrimination as to car supply—Interstate Commerce—Jurisdiction of Federal and State Courts.*

3. Where Congress prescribes a particular act in reference to interstate commerce, not in itself an offense at common law, jurisdiction with relation thereto attaches to the Federal courts.

4. Where the act is an offense at common law, and made so as well by State statute, in such case, except as other reasons may be shown, there is concurrent jurisdiction of it in the State courts.

5. The Interstate Commerce Act does not attempt any more than does the common law to define what particular acts shall constitute unlawful discrimination, but commits that to the Interstate Commerce Commission.

6. When the Interstate Commerce Commission has by its orders declared any particular practice, or regulation observed by an interstate corporation as unreasonably discriminating, it is as though Congress had specially legislated with respect thereto, and such circumstance draws exclusive jurisdiction of the offense to the Federal tribunal.

7. Except as to the thing the commission has defined and denounced as undue discrimination, the discrimination complained of may be adjudged by the State courts according to their own statute or the common law as the case may be.

8. Where a railroad company engaged in the transportation of coal, groups mines for purposes of service and for the equitable distribution of cars, and the Interstate Commerce Commission has made no order affecting the system adopted in its relation to the distribution of cars engaged in interstate commerce, a State court has jurisdiction over a suit brought by a shipper against the railroad company for an alleged flagrant departure from the system resulting in an unlawful discrimination against the plaintiff, without reference to whether the cars are intended for interstate or intrastate shipments.

*Carriers—Discrimination—Supply of coal cars—Damages.*

9. Where a railroad company divides the mines along its line into two districts, and rates the several mines in each district according to their respective producing capacity with a view to determine a just distribution of cars during a period of shortage, and it appears that the company during such period gives to one coal company operating in one of the districts an excess of cars daily during the period of shortage, the railroad company will be liable in damages to a coal company in the other district which has been deprived of its fair share of cars.

10. Where an action against a railroad company for unlawful discrimination in the distribution of coal cars is tried by the court without a jury, and the only question considered at the trial was the distribution of the railroad company's own cars, without any reference to private or individual cars owned by operators, the railroad company cannot for the first time on exceptions to the court's findings of fact and conclusions of law, claim that the

court erred in not taking into account private or individual cars in determining the extent of the discrimination against the plaintiff.

11. Even if such a question had been raised at the trial as a matter of defense, the court would have been justified in ignoring it, if it appeared that the system of distribution of cars, acquiesced in by all parties as proper, left out of consideration private cars in plain violation of the Interstate Commerce Act, and that the railroad company now claimed to disregard its own basis of distribution, not because it was inequitable, but solely with a view of giving a particular shipper an unlawful preference, thus seeking to mitigate the consequences of its own dereliction by having applied the rule it had defied.

12. Where a case against a railroad for unlawful discrimination is tried by the court without a jury, the court may include in the general damages assessed against the defendant additional damages for the delay in the settlement of the plaintiff's claim. In such a case the court's findings of fact are to be regarded in the same manner as the verdict of a jury.

*Carriers—Discrimination—Pleading—Cause of action.*

13. In an action against a railroad company for an unlawful discrimination in the distribution of coal cars, where the statement of claim alleges two certain discriminatory acts, the statement may be amended after the running of the statute of limitations by charging that the plaintiffs as a consequence of the alleged two discriminatory acts were prevented from shipping a larger amount of tonnage, and were therefore entitled to a larger amount of damage, than was claimed for in the original statement. Such amendment does not introduce a new cause of action.

Argued April 18, 1912. Appeal, No. 99, Jan. T., 1912, by defendant, from judgment of C. P. Clearfield Co., May T., 1908, No. 221, for plaintiff on case tried by the court without a jury in suit of Puritan Coal Mining Co. v. Pennsylvania Railroad Company. Before FELL, C. J., MESTREZAT, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Trespass to recover damages for unlawful discrimination in the distribution of coal cars.

The case was tried by SMITH, P. J., without a jury, under the Act of April 22, 1874, P. L. 109.

On April 13, 1911, more than six years after the period covered by the action, the plaintiff moved to amend its statement so as to charge that it had been prevented from shipping because of the discrimination alleged in the original statement a larger amount of tonnage than was claimed for in the original statement, and that it was therefore entitled to a larger amount of damages.

The material portions of the plaintiff's original statement was as follows:

3. That the mines of the plaintiff and the mines of other shippers of bituminous coal, especially those of the Berwind-White Coal Mining Company are situated along or near the line or branch line of the defendant company in the county of Cambria, and that a large part of the coal mined and shipped from the premises controlled by the plaintiff during the period from the 1st day of April, A. D., 1902, to the 1st day of January, A. D. 1905, was shipped over said main line and branch of the defendant company by continuous carriage or shipment, and under the control and management of the defendant company, to points and places within the State of Pennsylvania.

4. That the defendant company during all of the period aforesaid arbitrarily assumed the right to estimate and determine the capacity of the plaintiff to produce coal from its mines, and did in fact estimate, fix and determine, and published the capacity of its mines, and did estimate, fix and determine the percentage of coal cars plaintiff was to receive each and every working day at its mines for use in the carriage and transportation of its product, and did in like manner estimate, fix and determine the producing capacity of all other mines upon its main line and branch lines, and did so fix and determine the percentage of coal cars the said several operators and owners of mines were entitled to have and receive for the carriage and transportation of the product of their mines.

5. That the duty and obligation of the defendant company as a common carrier and a public highway was to furnish coal cars to the plaintiff upon a basis of equality in proportion to its rated capacity to mine and produce coal, and according to the measure of duty fixed by itself in determining the percentage of the number of coal cars to which plaintiff was entitled out of the whole number the defendant had for daily distribution; but the defendant company disregarding its duty and obligation which it owed to the plaintiff, did unduly and unreasonably, as well as unlawfully and unjustly neglect and refuse to furnish the plaintiff with its pro rata share of coal cars it had for daily distribution and did subject the plaintiff to undue and unreasonable disadvantage and prejudice, in that it favored and did unduly and unreasonably discriminate in favor of the Berwind-White Coal Mining Company, in that it did in the daily distribution of its coal cars, distribute and give to said company five hundred (500) cars before distributing to the plaintiff any cars; and did thereby unjustly and unlawfully deprive the plaintiff of the just and fair amount of cars each day, to which the percentage fixed by the defendant company entitled the plaintiff to receive and would have received except for said unjust, undue and unreasonable discrimination in favor of said Berwind-White Coal Mining Company.

6. That the defendant company did also unduly and unreasonably discriminate against the plaintiff and in favor of said Berwind-White Coal Mining Company, to the prejudice and disadvantage of the plaintiff, in that the said defendant did cause to be transferred from its ownership, custody and control, one thousand (1000) steel cars of large capacity, which it had purchased for use in the transportation of bituminous coal into interstate markets and places of interstate commerce to the said Berwind-White Coal Mining Company, and did by said transfer and sale deprive the plaintiff from receiving its pro rata percentage of said one thousand cars

for use in hauling and transporting the product of its mines, to points and places within the State of Pennsylvania.

7. That during all of said period of time, to wit, from the 1st day of April, A. D. 1902, to the 1st day of January, A. D. 1905, the plaintiff had a large and growing demand for the soft coal which it was mining and producing, that it had during all of said time constant demand and orders for its coal, in excess of the supply of coal cars furnished by the defendant company for transportation of the same to its customers, and could and would have mined and shipped a large amount of coal in excess of what it did mine and ship, to wit, 64,587 tons, which it would have sold to its customers therein at a price aggregating f. o. b. cars above costs of producing same the sum of $49,936.07, but was prevented from so doing by reason of the aforesaid undue and unreasonable discrimination in favor of the aforesaid Berwind-White Coal Mining Company. That because of said undue and unreasonable discriminatory acts, the plaintiff suffered damage and loss in its business of mining and selling its product in the markets of the soft coal trade and in points and places and to consumers of soft coal within the lines of the State of Pennsylvania and it, therefore, brings this action to recover compensation for said loss and damage in the sum of $49,936.07 with such additional amount as will compensate plaintiff for the delay on part of the defendant company.

On the motion to amend, SMITH, P. J., filed an opinion which was in part as follows:

The principal objection made by the learned counsel for the defendant to the statement is, that a new cause of action is introduced by the amended section eighth, corresponding to section seventh of the original statement. A careful examination of both statements convinces us that no new cause of action is in fact declared on. In both two particular acts of discrimination are

alleged, namely, first, the distribution to Berwind-White Coal Mining Company daily of 500 cars before any distribution made of a pro rata to the plaintiff company; and second, the sale by the defendant company to Berwind-White Coal Mining Company of 1,000 steel cars of large capacity, thereby depriving the plaintiff of its pro rata percentage of said cars. Both statements cover the same period of time and allege identically the same discriminatory acts. In the original statement, however, plaintiff alleges a certain definite number of tons of coal which it could have shipped in excess of what it did ship, being prevented so to do by reason of the alleged two undue and unreasonable acts of discrimination in favor of Berwind-White Coal Mining Company. In the amended statement although in somewhat different language, the same allegation is made, that is, that it could have mined and shipped a large amount of coal in excess of what it did mine and ship and claims for the profit thereon as in the original statement, except that it claims for a very much larger amount of tonnage which it was deprived from shipping by reason of the discriminatory acts of the defendant and in consequence declares for a much larger sum of money. We are of opinion, therefore, that all that portion of the amended statement exclusive of section three is allowable. The cause of action, in our judgment, is the same, that is, two certain alleged discriminatory acts. The amendment appears to declare merely on the consequences of those discriminatory acts and alleges aggravation of the injury, in that they were prevented from shipping a larger amount of tonnage and therefore entitled to a larger amount of damage than was claimed for in the original statement.

In Knapp v. Hartung, 73 Pa. 290, 294, is a case almost identical in principle with the case in hand. In that case the Supreme Court reversed the lower court for striking off amendments declaring for a number of additional items, on the ground that both statements were

based on the same cause of action, namely, the breaking of the close.   The case also lays down the principle that the amendment acts must receive a liberal construction. In a number of cases in Pennsylvania, where the amended statement did not vary from the original statement in an allegation as to the particular language, action or acts alleged as the basis of recovery, but where the mode of stating the complaint or of setting out the circumstances together with a statement of the consequences and aggravation of the injury sustained has been modified or amended, such amendments have been allowed by the lower courts and sustained by higher courts: Jackson v. Gunton, 26 Pa. Superior Ct. 203; Herbstritt v. Lackawanna Lumber Co., 212 Pa. 495; Fredericks v. Penna. Canal Co., 148 Pa. 317.   Very recent cases recognizing this principle are Coll v. Westinghouse Elect. & Mfg. Co., 230 Pa. 86; First National Bank v. Slate Co., 229 Pa. 27.   Amended statements increasing claim for damages are permitted.   See Tassey v. Church, 4 W. & S. 141; Clark v. Herring, 5 Binney 33; Stainer v. Insurance Co., 13 Pa. Superior Ct. 25.

The cases relied on by the learned counsel for defendant are clear cases where the amended statement introduced new or different causes of action barred by the statute.   Allen v. Tuscarora Valley Railroad Co., 229 Pa. 97, was where the original declaration alleged negligence of the defendant company in failing to comply with its duty of furnishing car couplers of reasonable safety, while the amended declaration alleged that the defendant corporation was engaged in interstate commerce and as a common carrier so engaged failed to equip its cars as required by an act of Congress.   This was held to be introducing a new cause of action barred by the statute, and of that there can hardly be two opinions.   In Philadelphia v. Railroad Co., 203 Pa. 38, cited by counsel, the suit was by the city against the railroad company to recover the cost of paving streets occupied by the tracks of the company.   The original

statement did not aver any charter, contractual off statutory obligation on the railroad company to pay the cost of paving the streets, and hence when the city, after the statute of limitations had run against its claim, attempted to amend its statement so as to aver that the defendant company had by lease or merger acquired the franchises and assumed the burden of another railway company which had the obligation of paving the streets, it was held that such averment introduced an entirely new cause of action.  In Mitchell Coal & Coke Co. v. Pennsylvania Railroad Co., manuscript opinion by FER-GUSON, J., July 13th, 1910, in the Court of Common Pleas, No. 3, of Philadelphia, to No. 545, March Term, 1905, the attempted amendment was the introduction of other and different names of companies or corporations in favor of whom the defendant company had discriminated as against the plaintiff company, and hence is not this case.

Here, as before stated, two distinctive alleged discriminatory acts are averred, exactly similar in both the original and amended statements.  The effect, consequences or results of those acts is made a matter of amendment and of an enlarged claim for damages.  We fail to see where any new cause of action is alleged. The amendment is therefore allowed, striking out clause three therefrom, and the same directed to be marked filed.

Defendant made the following requests for findings of law:

1.  " 'The plaintiff is not entitled to recover because the evidence has established that it has parted with its ownership of the claim which forms the basis of the action, is not now the owner thereof, and is not entitled to the proceeds of any recovery that may be had thereon.' "

"Answer: 'Refused.  This point is based on the effect of a contract between the stockholders of the Puritan Coal Mining Company and John C. Martin, as shown in

defendant's Exhibit No. 1. That contract does not justify a finding that the Puritan Coal Mining Company, acting as a corporation, either by its stockholders or directors, ever assigned or attempted to assign this claim. In fact there is no evidence of any corporate action on the subject. The contract is fairly construed as one by which the stock and property of the Puritan Coal Mining Company was vested in John C. Martin, the price for which without this claim against the railroad company was on a fixed basis for said stock. The Puritan Coal Mining Company as a corporate entity was preserved in its existence for the purpose of carrying on this case against the defendant company, then already brought, to its conclusion and the price of the stock of the said company was to be increased by whatever amount should be recovered from the defendant corporation in this litigation. To our minds there is nothing illegal in such contract and nothing to destroy its validity or to destroy the claim as against the defendant corporation, being a valid and subsisting claim at the time of this contract.' " (3)

2. " 'The plaintiff is not entitled to recover because this court is without jurisdiction to entertain the cause of action asserted, exclusive jurisdiction over actions of this character having been vested by the acts of Congress, commonly known as the "Interstate Commerce Acts," in the Federal tribunals.' " Refused. (4)

3. " 'Under the law and the evidence the plaintiff is not entitled to recover.' " Refused. (5)

Among the exceptions filed to the conclusions of the court were the following:

"33. The court erred in failing to take into account the private or individual cars, so-called, which were delivered to the plaintiff during the period of the action in determining the number which it would have been entitled to receive of the additional cars which the court has found should have been allotted to the region or district in which the plaintiff's mines were located."

"Ruling: This exception raises a question not before considered by the court and never suggested by counsel. The method by which the court calculated the damages of the plaintiff left out of consideration the individual cars placed in both the Mountain Division and the Scalp Level Division.  This method was adopted by the court for the reason that individual cars were not charged against owners in making distribution until 1906, as shown by the testimony of Mr. Trump, on pages 200 and 201.  This date was long after the period of the action. The defendant company, therefore, as a matter of law and morals should be bound by the position it made for itself and should be estopped from repudiating the rule it enforced, even if later it is found that such rule was technically wrong.  This, for the principle that no suitor may come into court and assert a principle or maintain a position that would enable it to profit by its own wrong.  Prior to and at the trial of the case the defendant never presented a claim that individual cars should be taken into consideration and never before these exceptions were filed made any claim that by excluding individual cars a different amount of damage would be ascertained.  Without great labor at this time we are wholly unable to determine whether the amount of damages found by the court would be changed by taking into consideration individual cars.  The theory, however, on which the railroad acted in distributing cars to its patrons by excluding or not charging against such patrons the individual cars placed, during the period of the action, is we believe the true measure of damages as set out in the schedule adopted by the court.  The defendant company should be estopped from claiming any other measure, even if in its favor, on the same principle or feature of the doctrine of estoppel expressed in Railway Co. v. McCarthy, 96 U. S. 258, 268.  In that case Justice SWAYNE says, 'Where a party gives a reason for his conduct and decision touching anything involved in a

controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.' To the same effect is Honesdale Ice Co. v. Improvement Co., 232 Pa. 293, 300. Moreover to adopt any other theory after the fact and policy of the method of distribution followed by the defendant would work a manifest hardship against a shipper suing for damages who had no individual cars. This is especially true, if the method of calculating and scheduling damages adopted by the court is the correct theory in this case, because the Mountain Division did have a certain proportion of individual cars just as did the Scalp Level Division. But if some unfortunate individual shipper of the Mountain Division had no private or individual cars during the period of his action, he would be charged with his proportion of individual cars placed in his division, manifestly to his injury, on the theory of damages adopted by the court. This of itself proves its falsity. Moreover it is apparent from the tables obtained from the distribution sheets that the individual cars of the Mountain Division were less than those of the South Fork and Scalp Level Division, the former being 67,395 and the latter 81,031. Of what avail then would be the present claim of the defendant that the method adopted by the court was not the true method? Again, the kind, character and size of the individual cars placed, either to the Mountain Division or to the South Fork and Scalp Level Division, were not scheduled in the case, for which reason alone no equitable basis of calculation could have been made by the court. As shown in the testimony, the favored shipper, namely, Berwind-White Coal Mining Company, obtained from the defendant company as its own individual cars at least one thousand steels cars counted as two in our calculation, while the testimony also shows that whatever of individual cars the plaintiff company had

were of a lesser capacity. Manifestly, therefore, the court could not have made and cannot now make from any data in the case an equitable schedule of damages on the theory now for the first time presented in this exception. That theory might have been of some consequence had the court adopted the theories of damages claimed by the plaintiff, in which only the respective car supplies of the plaintiff company and the Berwind-White Coal Mining Company were considered. Not having adopted the plaintiff's theory of damages, the court is of the opinion that the defendant railroad company should be bound by its own course of conduct and method of distribution in dealing with both the individual cars of the plaintiff company as the party discriminated against and as to the Berwind-White Coal Mining Company, the favored shipper.

"In connection with this exception defendant's counsel submitted a schedule of damages alleged to have been based on the court's theory of the case, which shows injury to the extent of $33,797.69, without damages in lieu of interest. The vice of this schedule is that it starts with the sixth column of the schedule adopted by the court, showing 'net shortage in cars, steel as two.' The results in the sixth column are obtained by comparison between the Mountain Division and the Scalp Level Division of all cars other than individual cars placed in both regions. No individual cars in either region enters into the equalization shown in the court's first column. The result of the defendant's schedule, therefore, is that the plaintiff company is charged with its proportion of individual cars twice, while the individual cars furnished to the favored shipper has never been considered in the calculation. This schedule it is presumed was intended to be attached and made a part of this exception and is so treated. From it thus attached the truth of the above objections can be readily ascertained. For the above reasons, therefore, this exception is hereby overruled." (12)

"34. The court erred in including the damages which it found had been sustained by the plaintiff a sum equal to interest at 6 per cent. for seven and a half years as damages for delay."

"Ruling: This exception raises the question of the allowance by the court of a specific sum as compensation for the delay in the payment of damages assessed. The allowance by the court of that sum is based upon the principle laid down in many decisions. In the syllabii to Richards v. Citizens Nat. Gas. Co., 130 Pa. 37, it is held: '3. In actions for unliquidated damages, whether sounding in tort or in contract, whenever the damages are to be assessed on the principle of compensation and with the reference to a definite standard such as market value, the jury may give additional damages in the nature of interest. 4. Such additional damages are not properly interest nor are they recoverable of right as interest is; they are simply compensation for delay measured by the rate of interest and their allowance depends upon the circumstances of each case and is to be determined by the jury.' A number of cases prior thereto are cited by the learned court in support of that position. The same principle is affirmed in a recent case, Wayne v. Pennsylvania Railroad Co., 231 Pa. 512. In Pierce v. Lehigh Valley Coal Co., 232 Pa. 170, one of the latest utterances of the Supreme Court on the subject, is in a case where the allowance by the jury of a sum as compensation for delay was stricken off by the lower court and sustained by the higher court. The opinion of Mr. Justice MESTREZAT states the principle underlying the whole subject. 'The right to compensation for delay in the payment of damages arising out of a tort depends upon the circumstances of the case. It is, therefore, usually a question for the jury under the evidence submitted. If the fault of nonpayment of the claim rests with the defendant, he cannot complain if he is required to compensate for the delay. If, on the other hand, the fault lies with the plaintiff by reason

of an excessive and unconscionable demand, one which the defendant is required to protect himself against by litigation, he should not be penalized for the unwarranted conduct of the plaintiff and required to pay damages for the delay in settlement of the claim.'

"Applying these principles to the case in hand, was the court justified, acting as he was as the jury in this case, in assessing 45 per cent. as compensation for the delay? The law, the facts and the justice of this case, as we believe, justify the allowance. To determine this a brief review of the case and the claim is necessary. The original præcipe, filed March 26th, 1908, claimed for damages not exceeding $75,000. Plaintiff's statement, filed November 21st, 1908, claimed the right to recover $49,936.07, with an additional amount to compensate for delay. About the same time plaintiff brought suit in the Circuit Court of the United States, against the same defendant, claiming the right to recover $242,999.65, for the same alleged discrimination based on identically the same facts, claiming, however, to recover in that court because of the jurisdiction of said court over interstate commerce. On April 3d, 1911, plaintiff in this case was allowed to amend its præcipe by substituting a statement for damages to the amount of $300,000, instead of $75,000, and a declaration was filed in this court claiming the right to recover $260,-777.96, on exactly the same alleged discriminatory acts as in the original statement. As appears in the testimony in this case, the larger claim by the later statement was based by plaintiff, by advice of counsel, upon their belief that the law gave plaintiff the right to recover in the jurisdiction of the State courts, for coal sold f. o. b. cars at the mines as a Pennsylvania delivery without regard to the question of the ultimate destination of the coal. The question thereby raised was merely one of jurisdiction as to the proper court in which such damages could be recovered, and the theory of the plaintiff was sustained in the trial of the cause by this court.

At the trial plaintiff contended the right to recover upwards of $200,000, without any allowance of compensation for delay, and by their exceptions still persist in such claim, while the court took a different theory of the elements of damage based on car distribution to the mountain region, of which the plaintiff was a part, rather than on a comparison between the plaintiff and the preferred shipper. The question involved therein is purely one of law so that, as we look at it, the claim of the plaintiff for a very much larger amount than that allowed by the court does not indicate that said claim was an excessive and unconscionable demand, although considerable in excess of that allowed by the court. The amount allowed by the court as shown in the table is a carefully worked out calculation of the coal tonnage of which the plaintiff company was deprived from shipping by the discriminatory acts of the defendant. This coal tonnage is based on the net shortage of cars of which plaintiff was deprived by the defendant in discrimination in favor of the Berwind-White Coal Mining Company, and these cars, if we are right in our theory, the plaintiff was entitled to have placed for loading daily during the period of the action. If this theory of damages is correct, why is not plaintiff also entitled to the several sums, calculated monthly as in said table, from the actual time when it was so deprived? The sum of $51,257.85 represents the damages as of the date when those damages occurred, from seven to nine years prior to the calculation and determination of this suit. The court allowed compensation for delay for only seven and one-half years although over one-half of the $51,257.85 was incurred more than nine years prior to the determination of this suit. Moreover, there is no testimony in the case going to show that the plaintiff is at fault in claiming damages against the defendant company. The facts in the case disclose a rank case of discrimination against the verbal, written and telegraphic protests of the manager of the plaintiff com-

pany. The attorney for the plaintiff company, in a personal interview with an officer of the defendant corporation, in March, 1903, called attention to the discriminatory acts and demanded fair treatment, and impliedly at least called attention to the defendant's liability for such acts and was told by the officer of the defendant company that said company was going to take care of Berwind and run all chances in doing it. At the trial of the case no defense in the nature of a denial of the discriminatory acts, or even of the legal view that such acts were discrimination, was presented by defendant's counsel. Defendant company, therefore, must be considered as knowing that the plaintiff company had a bona fide claim against said company, although suit was not brought or evidence of formal demand made until in the spring of 1908. No evidence was offered on either side to show that either plaintiff or defendant attempted to adjust this case out of court. The defendant has contended from start to finish of the case, so far as the evidence discloses, that there is absolutely no liability whatever, not because they deny or show by evidence that there was no discrimination but because of legal technicalities set up as a bar to the right of recovery. These they still maintain. The loss of profit per ton allowed by the court on the tonnage of which plaintiff was deprived was calculated with all of the elements favoring the defendant for which they could reasonably ask. Moreover, the amount as found by the court leaves out of view and calculation altogether the actual loss which the testimony would indicate the plaintiff suffered on the coal actually mined and shipped, amounting from five to ten cents per ton. If the testimony on that subject is to be believed, the plaintiff's mines were equipped for a very large tonnage, as much as 1,200 tons a day. By reason of the discrimination against them, in shortage of cars as well as by irregular car service, they were hampered and prevented from operating their mines so that even the

coal which they were able to ship cost ten cents per ton more than it should have cost had they been allowed their proper pro rata in car distribution. This element of damages alone · would amount to more than the amount awarded by the court as damages for delay. While not specifically claimed by plaintiff as an item of damages on their theory of the case, it could have been allowed under the general declaration of plaintiff as one of the elements going to make up its claim and distinctly growing out of the discrimination practiced."

Considering, therefore, all the facts and circumstances of this case as proven by the evidence, together also with the method of calculation by which the court fixed the damages at $51,257.85, we are of the opinion that we were clearly justified in adding 45 per cent. to that amount as compensation for the delay in paying it. The exception is, therefore, overruled. (17)

Judgment was entered by the court against the defendant for $74,323.88.

*Errors assigned,* among others, were (1) in allowing the filing of an amended statement; (3, 4, 5, 12, 17) above rulings, quoting them.

*Francis I. Gowen* and *John G. Johnson,* with them *Thomas H. Murray, James P. O'Laughlin & Hazard Alex. Murray,* for appellant.—The court had not jurisdiction: Baltimore & Ohio R. R. Co. v. United States, 215 U. S. 481 (30 Sup. Ct. Repr. 164); Southern Railway Co. v. Reid, 222 U. S. 444; Houston & Texas Cent. R. R. Co. v. Mayes, 201 U. S. 321 (26 Sup. Ct. Repr. 491); McNeill v. Ry. Co., 202 U. S. 543 (26 Sup. Ct. Repr. 722); United States v. Colorado & N. W. Ry. Co., 157 Fed. Repr. 321; Northern Pacific Ry. Co. v. Pacific Coast Lumber Mfrs. Assn., 165 Fed. Repr. 1; Van Patten v. R. R. Co., 74 Fed. Repr. 981; Sheldon v. Wabash R. Co., 105 Fed. Repr. 785; Texas & Pacific Ry. Co. v. Abi-

lene Cotton Oil Co., 204 U. S. 426 (27 Sup. Ct. Repr. 350).

Assuming the applicability of the State Act of 1883 to the distribution of cars used for intrastate shipments, no discrimination in the distribution of these is shown.

Allowance of damages in the nature of interest was not warranted: Pierce v. Lehigh Valley Coal Co., 232 Pa. 170; Richards v. Citizen's Nat. Gas Co., 130 Pa. 37.

The amendment of the statement was improperly allowed.

*A. M. Liveright* and *A. L. Cole,* for appellee.—The act to regulate commerce does not deprive the courts of Pennsylvania of jurisdiction to entertain actions at common law or under statute for recovery of damages caused by discrimination on the part of a common carrier: Minds v. R. R. Co., 228 Pa. 575; Hillsdale Coal & Coke Co. v. R. R. Co., 229 Pa. 61; Wright v. Adams Express Co., 230 Pa. 635; Wright v. Adams Express Co., 43 Pa. Superior Ct. 40; Chicago, Rock Island and Pacific Ry. Co. v. Arkansas, 219 U. S. 453; Western Union Tel. Co. v. Crovo, 220 U. S. 364; Chicago, Milwaukee & St. Paul Ry. Co. v. Solam, 169 U. S. 133 (18 Sup. Ct. Repr. 289); Tift v. Southern Ry. Co., 123 Fed. Repr. 789.

Plaintiff's measure of recovery is not governed by the uses to which the favored operator put the excess of cars by him received. The results worked by reason of the discrimination practiced are the controlling factor in determining the amount of damages by plaintiff sustained. The acts of discrimination constitute the cause, and all the consequences thereof as gathered from all the proofs, constitute the effect: Hillsdale Coal & Coke Co. v. R. R. Co., 229 Pa. 61; Minds v. R. R. Co., 228 Pa. 575.

Individual cars have no place in the comparative tables of distribution to the Mountain and Scalp Level Divisions, upon which damages should be awarded

under the court's ruling: Honesdale Ice Co. v. Improve-
ment Co., 232 Pa. 293; Ry. Co. v. McCarthy, 96 U. S.
258.

The court committed no error in holding that dam-
ages sustained by plaintiff were measurable by the loss
sustained by it on coal it would have sold delivered f.
o. b. mines, but for defendant's discrimination: Minds
v. Penna. R. R. Co., 228 Pa. 575; Missouri Pac. Ry. Co.
v. Larabee Flour Mills Co., 211 U. S. 612 (29 Sup. Ct.
Repr. 214); Wright v. B. & O. R. R. Co., 32 Pa. Su-
perior Ct. 5.

The court committed no error in determining cost of
production of additional coal which plaintiff could have
mined, and profits that would have been realized
thereon.

Both law and facts justify, the allowance of damages
in lieu of interest as compensation for delay: Pierce v.
Coal Co., 232 Pa. 170; Wayne v. Penna. Railroad Co.,
231 Pa. 512; Richards v. Citizens' Nat. Gas Co., 130
Pa. 37.

The allowance of the amended statement was in har-
mony with the principle that amendments should be
liberally permitted where the cause of action remains
unchanged: Knapp v. Hartung, 73 Pa. 290; Winton v.
Lackawanna Coal Co., 5 Lack. Jur. 289.

Aggravation of the injury is a recognized reason for
amending, when the full scope of the injury was not
originally declared:    Jackson v. Gunton, 26 Pa. Su-
perior Ct. 203; Herbstritt v. Lackawanna Lumber Co.,
212 Pa. 495; Fredericks v. Pennsylvania Canal Co., 148
Pa. 317; Erie City Iron Works v. Barber, 118 Pa. 6;
Taylor v. Canton Twp., 30 Pa. Superior Ct. 305; Chulek
v. Fire Ins. Co., 30 Pa. Superior Ct. 435; Schmelzer v.
Traction Co., 218 Pa. 29.

It is permissible to introduce amendments which will
increase the damages: Clark v. Herring, 5 Binney 33;
Tassey v. Church, 4 W. & S. 141; Stainer v. Insurance

Co., 13 Pa. Superior Ct. 25; Hunter v. Land, 81* Pa.
296.

OPINION BY MR. JUSTICE STEWART, October 14, 1912:
This was an action brought by the Puritan Coal Min-
ing Company against the Pennsylvania Railroad Com-
pany, to recover damages for alleged undue and unlaw-
ful discrimination against the plaintiff in the matter
of the distribution of cars for shipment of coal during
a period beginning 1 April, 1902, and ending 31 Decem-
ber, 1904. By agreement between the parties a trial by
jury was waived, and the case was heard by the court, re-
sulting in a judgment for the plaintiff in the sum of
$74,323.88. In discussing the points put in issue by
this appeal as indicated by the several assignments of
error, we shall observe the order followed by counsel
for appellant in their submitted brief of argument, and
confine the discussion to those questions which are there
urged upon our attention.

"(1) The first proposition advanced in support of
the appeal is, that even if the plaintiff had at any time
a claim of the character asserted in the present action,
it had voluntarily transferred it to others prior to the
trial of the case, and had thereby deprived itself of the
right to maintain the action or to recover damages
claimed therein."

Briefly the facts are these: During the period cover-
ing the alleged discrimination, and at the commence-
ment of the action, three individuals owned the entire
capital stock of the plaintiff corporation. Subsequently,
by a written agreement, these persons sold the stock,
reserving to themselves individually the claim covered
by the present action, with the right of access to the
books and papers of the company and the right to con-
tinue the present action in its name, with the further
stipulation that in case of settlement by the coal com-
pany, the money received therefor was to be paid over
to the three selling the stock, who were to have the

entire control of any adjustment or settlement. The objection urged in the court below, and here renewed, is that the transaction was a virtual assignment by the coal company of its claim for damages to the individuals so parting with their stock; and that because of the character of the claim recovery cannot be had therefor in the name of the assignor. The argument in support of the contention fails to distinguish between the corporation and its shareholders. They are not one and the same. The latter are not owners of the property of the corporation, but the title to the property rests exclusively in the entity called the corporation. It follows that shareholders of a corporation have not, by mere fact of being shareholders, any agency for the corporation or any authority to act for it; nor can they convey or assign its property although all unite, unless through formal action of the corporation they have been made its agents to that end: 10 Cyc. 374. None of the stipulations in the contract for the sale and purchase of this stock bound the corporation in the remotest way. It could have refused the use of its name in an action for the recovery of this specific claim, and it could have denied the vendors of the stock access to the books of the company without incurring corporate liability. The claim remained the claim of the corporation notwithstanding the fact that the individual shareholders had agreed that others ceasing to be shareholders should receive the benefit of it. With the rights and equities of these parties as between themselves we have here no concern; nor does it concern us to anticipate what the corporation may or may not do with the damages in the event it recovers.

The second proposition which appellant seeks to maintain is as follows:

"(2) That the court below was without jurisdiction to entertain the action, due to the fact that the only subsisting obligations to which the defendant was subject, in respect to the distribution of its cars during the

period of the action, were those imposed upon it by the acts of the Congress of the United States known as the 'Interstate Commerce Acts,' which acts prescribe and designate the forums in which actions for nonobservance of the obligations thereof may be brought, these being either the commission created by these acts or the Federal courts and not the state courts."

For a correct understanding of the point involved, a fuller statement of the facts is here necessary. That we may do no injustice to appellant in this regard we recite the facts as they are stated in the history of the case furnished by itself, and we accept these with the single qualification that it nowhere appears that the shortage of cars, the subject of plaintiff's complaint, was due to the delivery of an excessive number to the Berwind-White Coal Mining Company.

"The defendant, during the period of the action was engaged in the transportation of bituminous coal, and the plaintiff was a shipper over its lines.

The coal transported by the defendant was transported to points both within and without the State of Pennsylvania, and this was true of that shipped by the plaintiff.

To facilitate the distribution of its coal cars among the operators on its lines, the coal territory tributary to the defendant's lines had been divided by it into several regions or districts. The mines of the plaintiff, three in number, known as 'Puritan Nos. 1, 3 and 5,' were located in a district known as the 'Pittsburg—East End' or 'Mountain' district. The Berwind-White Coal Mining Company owned and operated a large number of mines also located on the line of the defendant, which were situated in a district known as the 'Scalp Level' district. All of the mines on the defendant's lines were given certain ratings based upon their shipping capacity, and the distribution of the cars in times of shortage was, as a rule, made in accordance with these ratings.

In the period of the action, however, which included
the period of the anthracite coal strike of 1902, the dis-
tribution of cars in accordance with the ratings was
largely departed from, and that actually made was con-
trolled, more or less, by what were known and are re-
ferred to in the testimony as 'special orders.' The dis-
tribution made to the Berwind-White Coal Company's
mines was largely of this character.

Separate distributions of its cars were not made by
the defendant for shipments to points within and with-
out the State, respectively; but one distribution was
made, and no control was exercised or was attempted
to be exercised by the defendant over the use which
should be made of the cars as between the two classes
of shipments, this being left optional with the operator
to whom the cars were delivered, who could use them
entirely for shipments to points within the State, or part
for one and part for the other purposes.

The plaintiff, upon the theory that, having regard to
their respective ratings, the Berwind-White Coal Min-
ing Company, under and by virtue of the special orders
in its favor had secured a larger number of cars than
it had received, instituted the present action, and by its
statement alleged and charged that it had been unjustly
deprived of a portion of the cars which the ratings of
its mines entitled it to, due to the delivery of an exces-
sive number to the Berwind-White Coal Mining Com-
pany."

From this statement of the facts, and the claim of the
plaintiff based thereon, it is quite apparent that noth-
ing was involved but the single question whether, in
the matter of the distribution of its cars, the defendant
unduly and unreasonably discriminated against the
plaintiff to the latter's loss and injury, by furnishing to
a competitor shipping facilities for transportation to a
measure and degree denied and refused the plaintiff
under like conditions. If the case was with the plaintiff
on its facts—and it is so found—then we have an offense

threefold in character: first, an offense against common law; second, an offense against the Federal statute regulating interstate commerce, which by the third section provides that it shall be unlawful for any common carrier subject to its provisions, "to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any way whatsoever, or to subject any particular person, company, firm, corporation, or any locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;" and, third, an offense against our own State statute of June 4, 1883, P. L. 72, which declares that "any undue or unreasonable discrimination by any railroad company, or other common carrier.......in charge for or in facilities for, the transportation of freight within the State, or coming from or going to any other state," shall be unlawful. For injury so sustained to what tribunal may the injured party look for redress? Are the courts of his own state closed against him, and must his only recourse be to a Federal tribunal? Were the question an untried one, its determination would necessarily involve a study and consideration of those principles and rules which are applied to questions arising out of the dual character of our government. This, however, may here be avoided, since, as we view the case, its determination may be rested on express authority defining and determining the scope and effect of the Federal statute. By repeated decisions of the Supreme Court of the United States within recent years, the boundary line limiting state jurisdiction in matters which may affect interstate commerce, has been so clearly indicated, that when a question such as this arises we have but to decide whether the particular offense complained of falls on the hither side of the boundary line or beyond; not that Federal jurisdiction is thereby correspondingly limited, but, when the latter

invades the limits allowed the state, the jurisdiction becomes concurrent. We refer specially to the case of Missouri Pacific Ry. Co. v. Larabee Flour Mills, 211 U. S. 612, wherein it is distinctly held, that where exclusive jurisdiction is claimed for the Federal courts under the Interstate Commerce Act, the primary, and, if answered affirmatively, the only question, must be, has Congress legislated with respect to the particular act of discrimination complained of by regulation or otherwise? If it has, then exclusive jurisdiction results to the Federal courts; if it has not, then, and only then, is the question whether the state act conflicts with the Federal statute by imposing burdens and hindrances upon interstate commerce to be considered. In the case cited the controversy arose from the refusal of the railroad company to make transfer of empty cars from a transfer track maintained by the offending road to another connecting road to the mills and elevator of the plaintiff. The two roads had held themselves out as ready to do such transferring. The ground of refusal to make the transfer was that the shipper had refused to pay certain demurrage charges against it. It was replied to this that the detention of the cars for which demurrage was charged, was occasioned solely by the inadequate and defective service of the railroad company. The contention of the plaintiff in this regard was sustained, and the case, as so resolved, presented the same question we have here—whether for discrimination in furnishing facilities for transportation the carrier was amenable solely to Federal law. In the opinion delivered by Mr. Justice BREWER we have such an explicit statement of the facts, and such a clear exposition of the law governing, that nothing will adequately supply what a liberal quotation therefrom will furnish. On page 620, he says:

"but the main contention on the part of the Missouri Pacific runs along an entirely different line. It is that the Missouri Pacific and the Santa Fe are common car-

riers, engaged in interstate commerce, and as such are subject to the control of Congress, and, therefore, in these respects not amenable to the power of the state. It appears from the findings that about three-fifths of the flour of the mill company is shipped out of the state, while the other two-fifths is shipped to points within the state. In addition, the hauling of the empty cars from the Santa Fe track to the mill was, if commerce at all, commerce within the state.

The roads are, therefore, engaged in both interstate commerce and that within the state. In the former they are subject to the regulation of Congress; in the latter to that of the state, and to enforce the proper relation between Congress and the state the full control of each over the commerce subject to its dominion must be preserved: Fairbank v. United States, 181 U. S. 283. How the separateness of control is to be accomplished it is unnecessary to determine. Its existence is recognized in the first section of the Interstate Commerce Act of February 4, 1887, c. 104, Stat. 379, as well as that of June 29, 1906, c. 3591, 34 Stat. 584, for each provides: 'That the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or territory as aforesaid.' This case does not rest upon any distinction between interstate commerce and that wholly within the state. It is the contention of counsel for the mill company that it comes within the oft-repeated rule that the state, in the absence of express action of Congress, may regulate many matters which indirectly affect interstate commerce, but which are for the comfort and convenience of its citizens. Of the existence of such a rule there can be no question. It is settled and illustrated by many cases. Thus, in Cooley v. Board of Wardens of Port of Philadelphia, 12 How. (53 U. S.) 299, it was held that a regulation of pilots and pilotage was a regu-

lation of commerce within the grant of the power of Congress, but further that (p. 319) : 'The mere grant of such a power to Congress did not imply a prohibition on the states to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power of the states, and the states may legislate in the absence of congressional regulations: Sturges v. Crowinshield, 4 Wheat. (17 U. S.) 122, 193; Houston v. Moore, 5 Wheat. (18 U. S.) 1; Willson v. Blackbird Creek Company, 2 Pet. (27 U. S.) 245, 251.

In Cleveland, &c., Ry. Co. v. Illinois, 177 U. S. 514, is a collection by Mr. Justice BROWN, speaking for this court, of a number of these cases. We quote from the opinion (pp. 516-517) : 'Few classes of cases have become more common of recent years than those wherein the police power of the state over the vehicles of interstate commerce has been drawn in question. That such power exists and will be enforced, notwithstanding the constitutional anthority of Congress to regulate such commerce, is. evident from the large number of cases in which we have sustained the validity of local laws designed to secure the safety and comfort of passengers, employees, persons crossing railroad tracks, and adjacent property owners, as well as other regulations intended for the public good.'......On the other hand, it is said that Congress has already acted, has created the Interstate Commerce Commission, and given to it a large measure of control over interstate commerce. But the fact that Congress has entrusted power to that commission does not, in the absence of action by it, change the rule which existed prior to the creation of the commission. Congress could always regulate interstate commerce, and could make specific provisions in reference thereto, and yet this had not been held to interfere with the power of the states in these incidental matters. A mere delegation by Congress to the commission of a like power has no greater effect, and does not

of itself disturb the authority of the state. It is not contended that the commission has taken any action in respect to the particular matters involved. It may never do so, and no one can in advance anticipate what it will do when it acts. Until then the authority of the state in merely incidental matters remains undisturbed. In other words, the mere grant by Congress to the commission does not of itself and in the absence of action by the commission interfere with the authority of the state to make those regulations conducive to the welfare and convenience of its citizens."

We derive from this opinion these inevitable conclusions: (1) that where Congress prescribes a particular act, not in itself an offense at common law, jurisdiction with relation thereto attaches to the Federal courts; (2) where the act is an offense at common law, and made so as well by state statute, in such case, except as other reasons may be shown, there is concurrent jurisdiction of it in the state courts; (3) that the Interstate Commerce Act does not attempt any more than does the common law to define what particular acts shall constitute unlawful discrimination, but commits that to the Interstate Commerce Commission; (4) that when this commission has by its orders declared any particular practice or regulation observed by an interstate corporation as unreasonably discriminating, it is as though Congress had specially legislated with respect thereto, and such circumstance draws exclusive jurisdiction of the offense to the Federal tribunal; (5) that except as to the thing the commission has defined and denounced as undue discrimination, the discrimination complained of may be adjudged by the state courts according to their own statute, or the common law as the case may be. It is only necessary to quote the following extract from the opinion in the later case of Southern Ry. Co. v. Reid, 222 U. S. 424, to show how the doctrine declared in the earlier case from which we have quoted at length is

there reasserted and applied. We quote from the opinion of Mr. Justice McKenna, page 436:

"It is well settled that if the state and Congress have a concurrent power, that of the state is superseded when the power of Congress is exercised. The question occurs: To what extent and how directly must it be exercised to have such effect? It was decided in Missouri Pacific Railway Co. v. Larabee Flour Mills, 211 U. S. 612, that the mere creation of the Interstate Commerce Commission and the grant to it of a large measure of control over interstate commerce does not, in the absence of action by it, change the rule that Congress by nonaction leaves power, in the states over merely incidental matters. 'In other words,' and we quote from the opinion (p. 623), 'the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the state to make those regulations conducive to the welfare and convenience of its citizens...... Until specific action by Congress or the commission the control over those incidental matters remains undisturbed,' the duty which was enforced in the state court was the duty of a railroad company engaged in interstate commerce to afford equal local switching service to its shippers, notwithstanding the cars concerning which the service was claimed were eventually to be engaged in interstate commerce. This duty was declared (p. 624) to be a common law duty which the state might, 'at least in the absence of congressional action, compel a carrier to discharge.' The principle of that case, therefore, requires us to find specific action either by Congress in the Interstate Commerce Act or by the commission, covering the matters which the statute of North Carolina attempts to regulate. There is no contention that the commission has acted, so we must look to the act. Does it, as contended by the plaintiff in error, take control of the subject matter and impose affirmative duties

upon the carriers which the state cannot even supple-
ment? In other words, has Congress taken possession
of the field?"

In the light of these express authorities all other ques-
tions may be eliminated from the present discussion
except this governing one; has Congress specifically leg-
islated with respect to the offense complained of? That
is to say, has it, either by the Interstate Commerce Act
in terms, or by any decree or order of the agency cre-
ated thereunder, the Interstate Commerce Commission,
declared that the matters here complained of as the
foundation of plaintiff's case shall constitute an undue
or unreasonable preference? For very evident reasons
the Federal statute is most general in its terms, dealing
specifically with few matters. Because it is only with
respect to very few matters affecting interstate com-
merce that conditions are so universally alike as to ad-
mit of one uniform system or plan of regulation with
respect thereto, Congress has committed to the Inter-
state Commerce Commission the task of definition; and
this the latter may perform in any case upon complaint
of any one claiming to have been damaged by unjust
discrimination at the hands of a common carrier under
the ninth section of the act. Under this provision the
commission has exercised a wide jurisdiction; it has ad-
judged isolated and peculiar cases; and in others, where
the adjudication was not dependent upon local and
other peculiar conditions, it has formulated general
rules for the observance of all. It is needless for our
purpose to cite instances of the former, and a single in-
stance of the latter will suffice. We cite it as much
because it is a case upon which the appellant relies as
supporting its present contention. Our reference is to
the case of the Interstate Commerce Commission v. Ill.
Cent. R. R. Co., 215 U. S. 452. There the controversy
began with the complaint of a collieries company filed
with the Interstate Commerce Commission complaining
that the Illinois Central Railroad Company was unduly

discriminating in the matter of car distribution, in not taking, into consideration the foreign railway fuel cars and private cars in determining the distribution of coal cars among the various operators along the line of the railroad or interstate shipments of coal. The commission held that the complaint was well founded, and awarded relief through an order so interpreting the Interstate Commerce Act as to require the railroad company to desist from such practice and establish regulations providing for the accounting of all such cars. Unwilling to comply with the order so made, the Illinois Central Railroad commenced this action to enjoin the enforcement of the order of the commission, alleging that the order was unjust and unreasonable for various reasons, and that in making the order the commission exceeded its power. The commission replied, traversing the allegations in the complaint, and asserting that the subject of the distribution of coal cars as dealt with by the order was within the administrative power delegated to the commission by the terms of the act regulating interstate commerce. From a decree enjoining the company from enforcing its order an appeal was sustained, and it was held that it is within the delegated power of the Interstate Commerce Commission to regulate railroad companies doing interstate business in the distribution of their cars, and required them to take into account its own fuel cars in order not to create a preference of the mines to which such cars are assigned over other mines. It is impossible to conceive of any local or other conditions which would prevent such order with respect to the fuel cars of the carrier from operating generally with the same measure of justice and equity to all, and hence we conclude that not only does the rule announced govern in the regulation of the Illinois Central Railroad Company, but that it applies to and governs, upon the authority of the cases above cited, all railroads; that it is as much the law of the land as though written in the lines of the Interstate Com-

merce Act, and that having been legislated upon by the commission exclusive jurisdiction with respect thereto vests in the Federal tribunal. It is only necessary to distinguish between the subject of the complaint in that case and this. There, by the action of the commerce commission, again using the language of Mr. Justice McKenna in the latter case above referred to, Congress had taken possession of this particular field, and had declared the refusal to take into account the fuel cars of the carrier unlawful. Here it is not complained that defendant had disregarded any order of the commission; nor has any order of the commission even remotely regulating the subject of the complaint here been shown. What is complained of is that the defendant having voluntarily adopted a system for the distribution of its cars which it must have regarded as just and equitable, and from which it makes no claim to be released, openly and flagrantly disregarded it by daily distributing to the Berwind-White Coal Company·a much larger number of cars than its rating called for, while furnishing complainant with less than it was entitled to under its rating. The grouping of plaintiff's mines in a class with others for purposes of service; the determination of the total number of cars to be devoted to such service; the ratings of the several mines within the group and the pro rata of distribution, were not matters regulated by the order of the commission, but matters decided upon by the defendant company with a view to avoid prejudice to the shipper. Had the plaintiff been dissatisfied with the regulation it could have appealed to the commission to correct it; had its appeal been sustained and followed by an order of amendment or correction of the regulation, then, upon subsequent disregard of the regulation as amended, plaintiff's only forum for relief would have been the Federal Court, since in that case again Congress would have taken possession of the field. But there is nothing of that kind here; nothing but a case of discrimination pure and simple; not a

specific offense created by the express terms of the Federal statute, not an offense against any order of the commerce commission, but an offense which could fall within the Federal statute and the common law as well, and so be held to have been legislated upon by Congress, only as the Interstate Commerce Commission has so declared. Our own State statute rests for its authority on the police power of the State, and its sole object is to prohibit common carriers which derive all their powers from the State, and have been granted these to the end that they may serve public necessity and convenience, from practicing undue and unreasonable discrimination between shippers in the service they are created to render. The exercise of this power in the way indicated is not interfered with by the Interstate Commerce Act in the absence of action by the commerce commission specifically directed against the particular matter complained of. The thing condemned by our State statute and by the common law was a purely incidental matter indirectly affecting interstate commerce, just as was the discrimination in the case of the Missouri Pacific Ry. Co. v. Larabee Flour Mills, 211 U. S. 612. The two cases on principle cannot be distinguished, and we but follow the plain guidance of that case in holding that the power of the State with respect to the subject matter of the present controversy remains undisturbed. It was not a question in the case whether the cars denied the plaintiff were intended for shipment within the State or beyond. It was sufficient that the offense was committed within the State. For the reasons stated we must decline to sustain the defendant's second proposition.

The third and fourth propositions are simply derived from the second; they call for no further discussion of the point raised, and we pass them. The fifth is as follows:

"5. That upon the assumption that the State Act of 1883 applied to the distribution by the defendant of cars used for intrastate shipments, and that the evidence had

established that in making such distribution the defendant had unjustly discriminated against the plaintiff, the method adopted by the court below for ascertaining the number of cars which the plaintiff was thereby deprived of, and the proportion of these which would have been used for intrastate shipments, was erroneous and hurtful to the defendant."

This contains but a single feature which calls for consideration, viz: that the method adopted by the court for ascertaining the number of cars the plaintiff was deprived of was erroneous. We shall consider this in connection with the sixth, which is as follows:

"6. That in the ascertainment of damages sustained by the plaintiff, due to its inability to mine and sell additional coal which the court below found it could have shipped had cars therefor been available, an assumed cost of production was adopted by the court which the evidence did not warrant, and certain payments which the plaintiff would have been obliged to make, had the additional coal been mined, were ignored and disregarded, and the assumed profits thereby materially enhanced."

To facilitate the distribution of its own cars, the defendant company determined by its own action to group into one the coal producing districts over which the Berwind-White Company mines were located, known as the Scalp Level district, and the district in which the plaintiff's mines were located, known as the Mountain district. It rated the several mines in each according to their respective producing capacity, with a view to determine a fair and just distribution of the cars which it allowed to be available during the continuance of the shortage. The court found that the aggregate distributive rate of the two divisions for the purpose of distribution was about equal, and adopted this fact for the determination of the measure of damages. In this connection we recite the fifth finding of fact by the court.

The effect of it can be understood only as it is given entire:

"Fifth. That beginning in the summer of 1902 the defendant company, by virtue of telegraphic orders issued from the general officers in charge of the operation of the defendant company and carried out by the officers and train crews of the said company, gave to the Berwind-White Coal Mining Company a preference in the distribution of cars on the defendant company's line, for use in the coal trade, over the mines of the Mountain division, and this preference, both directly and indirectly, affected the distribution of cars to the plaintiff company. These telegraphic orders for preference, as shown by the testimony, begin June 28th, 1902, from Superintendent Wallis, of said company, located at Altoona, to subordinate officers, and direct that a preference up to 500 cars daily shall be given to the mines of the Berwind-White Coal Mining Company at Scalp Level, and in addition thereto that from 100 to 250 cars be kept standing over each night so that the mines at Scalp Level shall be served early in the morning. That this preference in distribution affected the ratio of cars distributed to the plaintiff company as a part of the Mountain division appears in various telegrams, as follows: In that of J. M. Wallis to R. L. O'Donnel, under date of October 16th, 1902, as follows: 'Commencing at once please arrange to see that the mines of the Berwind-White Coal Mining Company at Scalp Level receive equal to 500 cars daily, counting steel cars as two, before placing, at any other operation in the Scalp Level region or on Mountain.' In telegram of October 21st, 1902, from Wallis to O'Donnel, 'In addition to having 500 cars at Scalp, in order to protect it I will be glad if you will make a special effort to have from 150 to 200 cars standing over there each night, even if you do not place cars on the Mountain for coal. The mines of the Berwin-White Coal Mining Company must be supplied with equal to 500 cars each day in

order that there may be no difficulty as result of acci-
dent or the cars being late. We are not prepared to
take any chances on getting the cars to Scalp, and in
addition to having 500 at their mines in time for loading
daily, in order to protect ourselves we should have an
extra 150 or 200 standing over each evening to start
them in the morning. Please so arrange.' Another tele-
gram of the same date, from Wallis to O'Donnel, reads
as follows: 'We are not meeting with the success neces-
sary to get 500 cars to Scalp daily. Will you please
refer to my telegram last week requesting that equal to
500 cars daily be placed at the mines of the Berwind-
White Coal Mining Company at Scalp, in addition to
the cars placed at Yellow Run mine, in preference to
placing cars at any other operation on the Mountain or
in the South Fork district and see that instructions
are carried out. Special efforts should be made to get
the cars to the mines in ample time for loading each
day. The Berwind-White Coal Mining Company have
not been able to coal the mail steamers in New York
harbor last week and this week. Most positive instruc-
tions should be issued and the arrangements carried out
that equal to 500 cars will be at Scalp Level region each
and every day before any attempt is made to supply cars
to the mines on the Mountain, South Fork district or
South Fork Railroad. Please advise if understood.'
And under date of November 22d, 1902, from J. M.
Wallis to R. Pitcairn, Pittsburg: 'Please give Berwind's
mines at Scalp all the cars you have in the territory for
to-morrow, cutting the other operations.' That this
preference continued and that it was a perference that
affected particularly the mines on the Mountain di-
vision appears later in a telegram from G. W. Creighton,
then superintendent at Altoona, to S. C. Long, superin-
tendent at Pittsburg, in the following language: 'Our
efforts this week in keeping Scalp supplied with cars
have not been successful. Please renew the instruc-
tions to all parties interested that before placing cars

for other operations on the Mountain or on the South Fork Railroad, equal to 500 cars must be placed for the Berwind-White Coal Mining Company each and every day until further notice, and it is important that sufficient cars should be placed early each morning so that all of the mines will have a supply to start with and there will be no danger of any operations being idle on account of not having cars. To protect ourselves on this arrangement I would be glad if you will arrange to accumulate and have standing over daily equal to 175 to 225 cars in addition to the 500 that are required for loading. This is absolutely necessary in order that the requirements of the Berwind-White Coal Mining Company can be met and the wishes of the management in the east carried out. The only exception that should be made to this order is for the Dunlo drift mine to have sufficient cars daily to protect the N. Y. P. & N. supply coal order, which I think is 200 tons per day. Acknowledge receipt.' Said special orders were not rescinded during the period of action."

That cars greatly in excess of its aggregate rating were given to the Scalp Level division during the period covered by the action is beyond dispute. It was not alleged that any mines in the division so favored shared in the excess other than the mines of the Berwind-White Company; nor was it averred that of those actually distributed to the Mountain division the plaintiff company did not receive its ratable proportion. This was, perhaps, not so direct a way of showing how many cars in excess of their rating the Berwind-White Company received, but it was none the less certain; not only did it furnish a correct basis for calculation, but the Berwind-White Company being the only party preferred so far as the evidence shows, this is in itself a sufficient answer to the objection that plaintiff's allegata and probata did not agree.

The complaint that the court did not take into account the private or individual cars in determining the

extent of the discrimination against the plaintiff introduces matter foreign to the issue in the case. The issue had regard to the cars owned by the defendant company. The period of discrimination complained of antedated the decision in the cases of Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U. S. 452, where it was held to be the duty of the interstate carrier in making distribution of its cars in times of shortage to include in the computation private cars in addition to its own. In making distribution of its own cars, exclusive of those owned by private parties, the defendant company was observing not only its own practice but that which had up to that time been prevailing. However general the practice, it was, as held in the case referred to, in plain violation of the Interstate Commerce Act. In making the present objection the defendant company would set up its own disregard and violation of law in mitigation. It had its own purpose to serve in excluding private cars from the computation. Whatever the purpose was, the scheme was acquiesced in by all shippers in the district as fair and equitable, with full knowledge of all facts, since so far as appears, none made complaint. Now that it has been made to appear that the defendant company disregarded its own basis of distribution, not because it was inequitable for the reason that the private cars had not been included in the computation, but solely with a view of giving a particular shipper an unlawful preference, it seeks to mitigate the consequences of its own dereliction by having applied a rule it defied when it established the basis of distribution upon which all acted throughout the entire transaction. Apart from this, while proper deference to the Interstate Commerce Commission would require our state courts to regard the furnishing of private cars as a fair equivalent of the same number of company cars, the fact that such cars were furnished, as the pleadings stood in this case, would be purely a substantive matter of defense. If the facts were as here

alleged by the defendant, it was its duty to establish them by evidence. It does not appear that in any of the requests for findings the court was asked to derive from the evidence anything that would support the present contention. The point itself was not raised or even distantly referred to in the course of the trial, but was indicated first in an exception to the court's conclusion. We accept the learned trial judge's reasons for dismissing the exception as entirely sufficient. He says, among other things, with respect to the matter:

"Again, the kind, character and size of the individual cars placed either to the Mountain division or to the South Fork and Scalp Level divisions were scheduled in the case for which reason alone no equitable basis of calculation could have been made by the court. As shown in the testimony, the favored shipper, viz, the Berwind-White Coal Mining Company, obtained from the defendant company as its own individual cars at least 1,000 steel cars counted as two in our calculation, while the testimony also shows that whatever of individual cars the plaintiff company had were of a lesser capacity. Manifestly, therefore, the court could not have made and cannot now make from any data in the case an equitable schedule of damages on the theory now for the first time presented in this exception."

It is further contended under this proposition that the cost per ton of mining the coal as it enters into the calculation of the plaintiff's damage is erroneous. A manifest error appears in the calculation submitted in support of this contention. The plaintiff's mines are there given a rated capacity of 47,476 cars, whereas the finding is that their rated capacity was 39,148 cars. That this difference seriously impairs the conclusion based thereon is manifest; to what extent exactly could be determined only by a calculation which we do not feel called upon to make. Still another contention is that the court erred in not taking into account the royalty per ton or net share of the net profits which under

its agreement plaintiff would have had to pay to the lessor of its mines in determining the cost of production to the plaintiff. The thirteenth finding of the court is as follows:

"Thirteenth. That the evidence shows that the fair average cost of producing coal at the plaintiff's mines during the period of the action, including royalty, had they been treated by the defendant company with a fair distribution of cars, was one dollar and ten cents per ton from April, 1902, to March, 1903, inclusive, and one dollar and fifteen cents per ton from April, 1903, to March, 1904, inclusive, and one dollar and twelve cents per ton for the period of the action thereafter."

This finding is directly contrary to what is here alleged. An appeal such as this brings up only questions of law on bills of exception to the rulings of the court; and its conclusions on the facts of the case are to be regarded in the same manner as a verdict of the jury: Gonser v. Smith, 115 Pa. 452.

We see nothing in the facts of this case that should exempt the defendant from its liability for the damages assessed against it for the delay in the settlement of the plaintiff's claim. The question of damages for delay in settlement of such cases is ordinarily for the jury under the evidence submitted. The court here discharging the function of the jury found the defendant in default in this regard without sufficient excuse on its part. We see no reason to interfere with that conclusion.

The final objection is to the allowance of plaintiff's amended statement. We are of opinion that the amendment introduced no new cause of action. The opinion of the learned trial judge fully sustains his action in that regard.

In what we have said all the assignments of error which have been brought to our attention in the argument submitted have been considered and passed upon. The assignments are overruled and the judgment is affirmed.