**UNIVERSITY COMPUTING COMPANY,**
**Plaintiff-Appellee-Cross-Appellant,**

**v.**

**LYKES–YOUNGSTOWN CORPORA-TION, Lykes-Youngstown Computer Services Corp., and Oliver F. Shinn, Defendants-Appellants-Cross-Appellees.**

No. 73–2688.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1974.

Rehearing and Rehearing En Banc
Denied Dec. 17, 1974.

Charles F. Clark, Ted R. Manry, III, Tampa, Fla., R. Byron Attridge, Atlanta, Ga., for defendants-appellants-cross-appellees.

Hugh M. Dorsey, Jr., W. Lyman Dillon, Atlanta, Ga., for plaintiff-appellee-cross-appellant.

Before BROWN, Chief Judge, TUTTLE, Circuit Judge, and YOUNG, District Judge.

TUTTLE, Circuit Judge:

## I. FACTS

This case involves three separate claims for damages arising out of a complicated series of transactions between four corporations and a number of their executive officers. The trial lasted three weeks and the record is correspondingly lengthy and complex. We begin by briefly summarizing the critical facts.

### A. *Joint Venture Agreement Between UCC and LYC.*

University Computing Company (UCC), a Texas corporation, and Lykes-Youngstown Corp. (LYC), a Delaware corporation, entered into a written agreement on July 1, 1969 to create jointly a new corporation, to be called Lykes-University Computing Company (Lykes/UCC), which was to offer com-

puter services[1] in the southeastern United States. This enterprise was a new venture for LYC, which is a large diversified holding company active in insurance, shipping and other manufacturing enterprises. UCC was active in other parts of the country, particularly in the southwest, offering essentially the same services as Lykes/UCC was to offer. The joint venture was designed to open new markets for the sale of UCC's computer systems.[2]

As part of their agreement and pursuant to it, UCC funded early operations of the new corporation, including payrolls, equipment purchases and other expenses. These expenditures totalled $66,647.45.[3] Several UCC employees were hired by the new corporation, including defendant Oliver Shinn who became President of Lykes/UCC.[4] The joint venture agreement provided UCC was to sell computer "hardware" (i. e., computer equipment) and "software" to the new corporation. UCC was further to receive 10% of the gross disbursements of the new corporation for the first year for "management services." LYC agreed to have its various controlled subsidiaries (with the exception of Youngstown Sheet and Tube Co.) purchase computer services from the new corporation. The agreement did not set forth in any greater detail the manner in which the corporation was to be managed, or by whom.

The new corporation, Lykes/UCC, was chartered in Delaware, and its articles of incorporation provided for a Board of Directors to be composed of four individuals, who then had the option of electing a fifth. This was pursuant to the terms of the joint venture agreement which provided that UCC and LYC would each select two members of the Board of Directors of Lykes/UCC.

By October, 1969, before either party had contributed capital and before stock had been issued, the two original members of the joint venture came to disagree over the day-to-day management of Lykes/UCC. The original intent of the parties is now in dispute, with UCC pointing to the fee for "management services" and other terms of the contract as evidence that it was intended to make operational management decisions, while LYC points to the terms of

1. Computer services entail both the sale of computer programs to customers who own their own computer equipment, and leasing of time on in-house computers. This latter type of service is referred to as functioning on a "service bureau basis" in the industry.

2. Computer systems are a series of computer programs designed to accomplish specific business tasks. Normally this entails programming the computer to generate specific reports to be used in making business decisions. The type of package sold by UCC included programs, programming instructions and computer language listings. In the industry the generic name for these materials is "software." For any given task any number of different systems can be used and vigorous competition exists between different computer systems firms selling retail merchandising systems. The technical information contained in a package sold by UCC would be valuable to a competitor and is regarded by UCC as a trade secret.

The costs of designing, developing, implementing and converting a business function such as accounts receivable accounting or retail merchandise inventory reporting, to an automated computer program are very large. Naturally programs which accomplish their functions efficiently and which contain unique procedures and methods are valuable in that they provide a competitive advantage for their owner.

3. Both parties agree UCC is entitled to $73,312.20 for actual expenditures of $66,647.45 from July 1 to October 7, and an additional 10% of those expenditures pursuant to the terms of their joint venture agreement as payment for "management services."

4. Shinn at the time of the joint venture was Vice President in charge of sales for UCC. His original contract of employment with UCC provided:

". . . I agree to hold in confidence all information regarding UCC's business and not to use such information to UCC's damage. . . . For a period of twenty-four (24) months following any termination, I agree not to compete with UCC in any state in which UCC operates a computer center."

The same clause was in all UCC employment contracts.

the contract, provisions of the Delaware Corporation Act and other extrinsic evidence to support its claim that the new corporation was to be wholly independent.

The parties aired their disagreements at a meeting held on September 30, 1969. The outcome of this meeting is now also in dispute. LYC claims UCC agreed to make a final decision, prior to October 7, about remaining in the joint venture and that in a telephone conversation on October 6 both sides agreed to terminate the joint venture. UCC claims the matter was left open at the meeting and thereafter, and that while both sides understood UCC would likely wish to withdraw, the terms of that withdrawal and the amount of compensation for initial expenditures and loss of prospective profits were left unsettled.

On October 7, 1969, a fourth corporation, Lykes-Youngstown Computer Services Corp. (LYCSC) was formed as a wholly owned subsidiary of LYC. Oliver Shinn became President of this corporation; all property formerly owned by Lykes/UCC was taken over by LYCSC, and the new subsidiary of LYC proceeded to enter into the business planned for Lykes/UCC. UCC had no part in the decision to create this fourth corporation, and UCC now claims it wasn't aware of the existence of LYCSC until a story on it appeared in the *Wall Street Journal* on October 14, 1969. It is undisputed that UCC did not authorize the creation of the new corporation, nor did UCC authorize the seizure of all Lykes/UCC's property.

While a draft of a rescission and termination agreement was prepared by UCC following the October 6 telephone conversation, and a copy was sent to LYC for its consideration, it is undisputed that the terms of UCC's withdrawal were unsettled and the parties remained in substantial disagreement over the amount of compensation UCC

was to receive. The draft agreement was not signed.

During the period between July 1 and September 30, while the disagreement over the management of Lykes/UCC was developing, Oliver Shinn met twice with executive officers of LYC. UCC claims to have been unaware that these meetings were taking place. In any event, it is undisputed that UCC certainly was unaware of the matters discussed at these meetings. Among these topics discussed were the desirability of Lykes/UCC being independent of UCC and LYC, the burden of paying the 10% management fee owed UCC under the joint venture agreement, and the fact that Shinn was confident the UCC name was unlikely to further sales efforts in the southeast where UCC was virtually unknown. Although one of the meetings Shinn had with LYC executives took place when he was still a Vice President of UCC, Shinn made it clear at the beginning of the meeting that he was there solely on his own behalf, and he felt no loyalty to his employer, UCC.

In preparation for the September 30 meeting between UCC and LYC, Shinn prepared a report which he made available only to LYC on a confidential basis. In that report Shinn demonstrated that for $688,000 LYC could fund a wholly owned subsidiary which would have substantially the same chances for success as the joint venture corporation, to which LYC had committed $500,000 for only half ownership. These secret meetings and the confidential Shinn memo were the primary evidence of LYC bad faith in terminating the joint venture agreement introduced at trial.

B. *Misappropriation of AIMES III By LYCSC.*

Among the computer systems Lykes/UCC was to market was a retail inventory control system owned by UCC called "AIMES III." (Automated Inventory Management Evaluation System). This system was designed to maintain information on inventory in

retail department stores.[5] UCC had previously sold the system to Leonard's Department Store in Fort Worth, Texas, subject to a restrictive use agreement which limited Leonard's to private and confidential use of the system. Leonard's paid $41,700 for the rights to restricted use of AIMES III. Lykes/UCC was to offer this system, as well as several others designed and owned by UCC, to customers in the southeast. The joint venture agreement provided for discount sales of these systems to Lykes/UCC at no more than 20% of UCC's development costs.

Following the incorporation of LYCSC (the newly created subsidiary of LYC), the new corporation proceeded to offer AIMES III to customers. Rather than purchase unrestricted rights to the system from UCC, LYCSC elected to steal the system from Leonard's. In December, 1969, LYCSC bribed an employee of Leonard's for $2500 to deliver a suitcase filled with computer tapes and other materials to an employee of LYCSC. In February, 1970, this same Leonard's employee was paid to fly to Atlanta from Dallas with additional tapes and documents once the materials originally obtained were found to be insufficient to run the system. With the new materials and the help of the Leonard's employee in installing the system in the LYCSC

in-house computer, LYCSC was able to run the system in its entirety.[6]

After receiving these materials in December, LYCSC attempted to market the AIMES III system. This marketing effort continued until April of the following year. Salesmen for LYCSC made offers to department stores in Atlanta, New Orleans and Tampa, Florida. In addition the system was offered to another computer services firm in Atlanta. While none of these offers was accepted, in several cases detailed sales presentations were made by sales representatives of LYCSC. A brochure was printed by LYCSC to assist the sales effort.[7]

C. *Judgment in District Court.*

UCC brought this suit against LYC, LYCSC and Oliver Shinn claiming damages under seven Counts. Counts 1 and 2 were combined at trial into a single count against LYC for breach of the joint venture agreement. Count 3 charged a conspiracy among the three defendants to misappropriate UCC's trade secret, AIMES III; Count 4 charged a conspiracy among the three defendants to convert unlawfully AIMES III; Count 5 charged a conspiracy among the three defendants to infringe UCC's common law copyright in AIMES III; Count 6 charged a conspiracy among the three defendants to vio-

---

5. The system was designed to generate reports on volume of inventory, broken down by specific items, and assess the quantity of each item sold for specific reporting periods.

6. By running the programs, LYCSC compiled a complete set of Cobol listings for the system. These listings, using a type of computer language designed to correspond to common business English, showed the various data the system could generate.

7. The system was offered both as "AIMES III" and as "MIMIC" (Maximum Information Through Merchandising Inventory Control), a system represented as having been developed by LYCSC. Rich's Department Store in Atlanta was offered MIMIC for $45,000; Colony Shops in Tampa was offered AIMES III for $42,000; and Technical Resources, a computer consulting firm, was offered MIMIC for restricted use only for $30,000.

The brochure identified the MIMIC system as being a retail merchandising inventory control system owned by LYCSC. LYCSC also occasionally used UCC sales literature after removing the UCC logo from the corner of the printed publications.

A former sales representative of UCC, David Hudson, was hired by LYCSC to direct this sales campaign. Hudson had negotiated the original Leonard's sales agreement when he was with UCC. After joining LYCSC, he arranged the theft and accepted delivery of the AIMES III system. Hudson had been trained by UCC to teach selling techniques, and had even conducted a course for Lykes/UCC sales personnel on techniques to be used in selling AIMES III prior to the termination of the joint venture. At this sales seminar, the sales literature and other publications on the AIMES III system which LYCSC subsequently used in its marketing campaign were distributed.

late Oliver Shinn's non-competition agreement with UCC; and finally Count 7 charged a conspiracy among the three defendants to induce a breach of the restrictive use agreement between Leonard's and UCC. Plaintiff conceded at trial Counts 3, 4, 5 and 7 all involved essentially the same damages for the misappropriation of the AIMES III system.

The district court granted a directed verdict for defendants on Counts 5 and 7. The remaining counts went to the jury, which returned verdicts against the plaintiff on Counts 4 and 6, against defendant LYC on Count 1 and against all three defendants on Count 3. The jury awarded $172,000 against LYC for its breach of the joint venture agreement (Counts 1 and 2); $220,000 against all three defendants for misappropriation of UCC's trade secret, AIMES III (Count 3); and finally the jury awarded $100,000 in attorneys' fees against LYC on Count 1.

Defendants bring this appeal attacking these verdicts on a number of different grounds. Plaintiff cross-appeals the directed verdict on Count 7, and the verdicts on Counts 4 and 6. We affirm the judgment of the court below on the jury verdict on Count 1 against defendant LYC, and on Count 3 against defendants LYC, LYCSC and Oliver Shinn. We affirm judgment on the jury verdict on Counts 4 and 6 against plaintiff UCC and affirm the directed verdict against plaintiff UCC on Count 7. We reverse and remand for a new trial on the issue of attorneys' fees.

## II. BREACH OF THE JOINT VENTURE AGREEMENT BY LYC.

A. *Enforceability of the Joint Venture Agreement.*

The jury found that LYC breached its July 1 joint venture agreement with UCC by unilaterally terminating the

joint venture corporation and appropriating the property and assets of the joint venture corporation for its own use. The defendant first challenges the validity of the July 1 agreement which it was found to have breached. LYC and UCC subsequent to July 1 were unable to agree as to how the agreement allocated management control. UCC claimed the right to make day-to-day operational decisions about such matters as employment, equipment acquisitions, and the like, while LYC claimed Lykes/UCC was intended to be independent of both the members of the joint venture and its President, Oliver Shinn, was to have a free hand in managing the new corporation. LYC's argument is that to the extent the joint venture agreement failed to settle this important question it was deficient.

 Under Georgia law [8] when the parties fail to agree on some element of a contract which affects the operation of the agreement in some extensive and important way, such a defect cannot subsequently be cured, and the contract is void for indefiniteness. We believe the testimony presented a jury question as to whether the parties agreed over operational control, and whether their July agreement can be so construed. The question whether there was a meeting of the minds of the two parties is essentially a factual one, and this would determine whether the agreement was enforceable. The problem here really is not that the parties had failed to consider and agree on some vital element of the contract, rather it is the parties' dispute as to what their original agreement was.

 The record amply supports the jury finding that the contract was enforceable. The written agreement's references to accounting and management services might on its face be ambiguous,[9] but there was sufficient pa-

8. Burden v. Thomas, 104 Ga.App. 300, 121 S.E.2d 684 (1961); West v. Downer, 218 Ga. 235, 127 S.E.2d 359 (1962); Bagwell-Hughes, Inc. v. McConnell, 224 Ga. 659, 164 S.E.2d 229 (1968).

9. The plaintiff claimed the word "management" was intended to mean the right to make decisions, as it normally is taken to mean: the defendants claimed the phrase "management services" had a technical

rol evidence for the terms to be understood by the jury as indicating the parties' intent that UCC exercise day-to-day operational supervision over the affairs of the new corporation. Further, the conduct of Oliver Shinn subsequent to his taking the position of President of Lykes/UCC supports this jury finding. Shinn used normal UCC procedures and accounting forms in requesting authorization for purchases, and sought UCC approval of his hiring guidelines. These actions are inconsistent with LYC's claim that he had always been meant to function independently of UCC. Until shortly before the ultimate rift between the parties, when he did in fact begin to act independently—thereby necessitating the September 30 meeting—Shinn performed essentially as a subordinate of UCC's President of the Data Link Division, Karl Young. Young was asked to approve all expenditures, down to so trivial an expenditure as moving expenses for a particular employee of Lykes/UCC. There was sufficient evidence that this pattern of conduct was what the parties intended that the jury could conclude the contract was complete and enforceable.

■ While LYC executives vigorously denied that they had ever agreed to this at trial, UCC executives just as vigorously testified that they had. On this type of factual dispute, concerning primarily the credibility of the witnesses, we are bound by the jury's findings. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (*en banc*).

■ The defendant next argues that if the UCC view of its asserted authority under the joint venture agreement to make operational decisions is accepted as being what the parties intended, the contract is nonetheless void under Delaware law as an illegal delegation of managerial authority.[10] We believe Delaware law is inapplicable to the type of delegation of authority involved in this case.

■ Title 8 of the Delaware Corporation Law, § 141(a) provides that the "business and affairs of every corporation organized under this chapter shall be managed by a board of directors . . .."[11] There is substantial case law limiting the power of a board of directors to delegate this ultimate authority[12] and in any case where a lawful delegation of managerial authority is made, such a delegation must be made through the Certificate of Incorporation.[13] No such express provision was made in the Certificate of Incorporation of Lykes/UCC, nor was Lykes/UCC incorporated as a closely held corporation which under Delaware

meaning in the computer industry and involved only advice on decisions and routine bookkeeping. The testimony was in conflict as to this question.

10. Alternatively, defendants argue that even were the contract to be enforceable under Delaware law, the jury should have been charged on the limits on a Board of Director's power to delegate managerial authority. We cannot agree. The central issue is the validity of the agreement. This is clearly a legal question, and one for the trial court to determine. Having decided the Delaware case law on delegation of power to be inapplicable to the joint venture agreement, the trial court properly refused defendants proposed jury instruction No. 8.

11. Article 7 of the Certificate of Incorporation of Lykes/UCC filed with the Secretary of State of Delaware specifically vested the management of the corporation in the Board

of Directors. Article 7.2(d) grants the Board the right "to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation. . . ."

12. *See* Adams v. Clearance, 35 Del.Ch. 459, 121 A.2d 302, (1956); Abercrombie v. Davies, 35 Del.Ch. 599, 123 A.2d 893 (Del.Ch. 1956). This case law is typical of the general rule against delegation of ultimate managerial authority. *See e.g.,* Puritan Coal Mining Co. v. Penn. Ry. Co., 237 Pa. 420, 85 A. 426 (1950), aff'd, 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 687 (1950); Long Park, Inc. v. Trenton-New Brunswick Theatres Co., 297 N.Y. 174, 77 N.E.2d 633 (1948).

13. Lehrman v. Cohen, 222 A.2d 800 (Del. 1966); Campbell v. Loew's Incorporated, 36 Del.Ch. 563, 134 A.2d 852 (Del.Ch.1957); Empire Southern Gas Co. v. Gray, 29 Del. Ch. 95, 46 A.2d 741 (Del.Ch.1940).

law [14] is permitted greater flexibility in delegating the authority of the board of directors than are all other corporations. We recognize that under Delaware law a board of directors cannot be ousted from ultimate managerial responsibility, but we do not believe that was what was agreed to here.

Rather, in our view, the joint venture agreement was intended to permit the board of directors of Lykes/UCC the type of ultimate decision-making responsibility called for by the Delaware Corporation Law, but intended day-to-day decisions normally left to the executive officers of a corporation to be left to UCC. Karl Young, at the time of the joint venture President of UCC's Data Link Division, testified at trial that the relationship of the President of Lykes/UCC to UCC was to be that of a Vice President of a data link region—with line responsibility for some decisions, but ultimately under the authority of the President of the Data Link Division. Young testified that "there was two levels of management involved here" distinguishing the type of authority the board of directors was to have from the type of authority UCC was to have:

> " . . . one level of management which I refer to as the day-to-day management, would be directed to data-link and to me. . . . Obviously there is another level of management. . . . And this is the Board level which is a far-reaching and investors' type of participation and concern. The Board would meet occasionally or rarely, maybe two, three times a year. And they would be concerned with whether or not we acquired another company or whether or not we made some great investment or far-reaching type of thing. . . ."

It seems clear to us that UCC was demanding something less than complete managerial control.[15]

Surely no one disputes the fact that executive officers who manage a corporation possess managerial authority which in one sense is delegated by the board of directors, but which no one would claim was affected by the rule against complete abrogation of board of directors' responsibility. Similarly here, while in one sense UCC's responsibility for making operational decisions is a delegation of authority by the board of directors, we do not believe that Delaware restrictions on delegation of ultimate managerial responsibility are applicable to the authority UCC claimed under the joint venture agreement.

B. *Challenges to Jury's Finding LYC Breached the Joint Venture Agreement.*

■ We conclude that there was more than adequate evidence for the jury to find that LYC breached the joint venture agreement with UCC. LYC could be found to have done this by unilaterally terminating Lykes/UCC, the joint venture corporation, and substituting in its place LYCSC, a wholly owned subsidiary which thereupon seized all the assets of Lykes/UCC and entered into the business planned for the joint venture. LYC's defense came down to its claim that UCC unilaterally withdrew from the venture after orally rescinding the agreement over the telephone. The pivotal conversation in LYC's account of events leading up to the dissolution of Lykes/UCC was one between Frank Nemec, then President of LYC, and Karl Young, then President of the Data Link Division of UCC, on October 6. Both men testified at trial, and both recounted substantially different accounts of the conversation—Nemec testifying that Young unconditionally withdraw on behalf of UCC, and Young denying any statement indicating UCC's intention to withdraw until the terms of withdrawal could be negotiated. This factual contro-

---

14. *See* the Delaware Closed Corporation Statute, Del. Code Ann. Title 8, §§ 341–356.

15. Indeed, the joint venture agreement explicitly provides that while UCC would be entitled to select computer hardware to sell or lease to Lykes/UCC, the board of directors was required to approve any purchase of hardware.

versy clearly comes down to the credibility of the two witnesses. We find no reason to upset the jury's finding that Young did not withdraw from the venture and that UCC's intention to withdraw was conditioned upon the two sides coming to terms over the amount of compensation UCC was to receive.

The evidence the jury received was conflicting, In addition to the direct conflict between Nemec's and Young's versions of the October 6 telephone conversation, there were a number of documents which each side used to support its claim. The documentary evidence was ambiguous, and thus while we don't find any of the evidence offered conclusive on this question, we are satisfied that the jury's decision that UCC did not unilaterally withdraw is permissible in light of all the evidence, and that in unilaterally terminating the joint venture on October 7 LYC breached its agreement with UCC.

## C. *Damages for Breach of the Joint Venture Agreement.*

We finally come to the question of damages. In attacking the verdict of $172,000, LYC claims that there was no substantial evidence to support UCC's claim that in breaching the joint venture agreement LYC appropriated assets and business opportunities belonging to the joint venture without UCC's knowledge or consent. In part this raises again the question of mutual termination of

the agreement which we have previously discussed.

We note there can be no doubt that LYCSC, LYC's subsidiary, appropriated the joint venture's property and business. In our view, once the jury found LYC breached the agreement with UCC, it was wholly justified in assessing damages in addition to the $66,647.45 which UCC had expended on behalf of LYKES/UCC before LYC's breach.[16] At trial UCC proved a variety of damages, including loss of the 10% management fee to October 1, 1970; loss of the 5% management fee for the period thereafter; loss of profits on sales and leases of hardware to Lykes/UCC as provided in the agreement; and finally loss of the opportunity to begin operations in the southeast with the guaranteed flow of revenues from the Lykes subsidiaries obliged to purchase computer services from the new corporation.[17] Together, the amount of damages subject to proof at trial on Count 1 totalled well in excess of two million dollars. We find the jury verdict of $172,000 was supported by the record.[18]

## III. MISAPPROPRIATION OF UCC'S TRADE SECRET, AIMES III, BY LYC, LYCSC, AND OLIVER SHINN.

The defendants admit that LYCSC paid one Ron Clinton, an employee of Leonard's Department Store in Fort

16. Ga. Code Ann. § 20–1407 provides for damages for breach of contract. The defendant does not challenge the jury verdict of $172,000 as an improper measure of damages under this section in the event we uphold the finding that it breached the joint venture agreement.

17. UCC took the position at trial that it was entitled to the value of the potentially successful business Lykes/UCC was to enjoy had it been under efficient management. The measure employed by UCC was to value the worth of Lykes/UCC were it to be purchased by a third party. Because UCC had in the past purchased a number of service centers which had on-going accounts, thereby building its business by acquisition, UCC executives testified that the value placed on a functioning service center by a

willing purchaser was one to two times its gross annual revenues. Using this measure, UCC placed a total value of 1 or 2 million dollars on the business opportunity LYC appropriated.

18. We reject defendant's argument that the jury should have been charged UCC was entitled only to an accounting for actual expenditures made on behalf of Lykes/UCC. The jury was properly charged that this type of an accounting was proper only if it was to find the two joint venturers had mutually decided to terminate the venture.

The defendant also challenged the admission of certain evidence which it claims was prejudicial. We find none of the evidentiary questions warrant upsetting the jury verdict on Count 1.

Worth, Texas, $2500 to induce him to steal Leonard's copy of the AIMES III system and deliver the tapes and documents comprising that system to an LYCSC employee. The defendants do not now claim that this conduct was lawful or even defensible.

The defendants do not challenge the finding of the jury that they acted in concert. If the jury finding of misappropriation of AIMES III is thus upheld, all three defendants properly share liability.

A. *Legal Standards on Protection of Trade Secrets*

A trade secret is protected against illegal appropriation and commercial use by a competitor. The development of this area of the law has been progressive, and most jurisdictions have developed similar standards.[19] What Georgia law exists in this area seems to follow the Restatement, Torts § 757.[20] We so held in Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5th Cir. 1969).[21]

■ Under the Restatement § 757 formulation, a trade secret is defined as:[22]

"Any formula, pattern, device or compilation of information which is used on one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."

In large measure the requirements simply are that "the parties view the process or device as a secret and that the secret be revealed in confidence . . ." *Water Services, supra,* 410 F.2d at 172.

Liability attaches under the Restatement if one "who discloses or uses another's trade secrets without a privilege to do so . . .

(a) . . . discovered the secret by improper means

or (b) his disclosure or use constitutes a breach of confidence reposed in him by the (owner of the secret) in disclosing the secret to him,

or (c) he learned from a third person with notice of the. facts that it was a secret and that the third person's disclosure of it was otherwise a breach of his duty to the (owner of the secret) . . ."

■ Unlike a patent which is totally protected for the period of time for which it is granted, the protection afforded a trade secret is limited—for it is protected only so long as competitors fail to duplicate it by legitimate, independent research. *Water Services, supra.*[23]

■ While the defendants in this action have deprecated the value of AIMES III[24] and made an effort at

---

19. *See generally* Ellis, Trade Secrets (1953); 2 Callmann, Unfair Competition and Trade-Marks, Ch. 14 (3d Ed. 1968); Ellis, Turner, Trade Secrets (1962); Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888, 947 (1964).

20. Restatement, Torts § 757 (1939).

21. *Construing* Alexis, Inc. v. Werbell, 209 Ga. 665, 668, 75 S.E.2d 168 (1953) and Stewart v. Hook, 118 Ga. 445, 45 S.E. 369 (1903). *See also* Durham v. Stand-By Labor of Georgia, Inc., 230 Ga. 558, 198 S.E.2d 145 (1973) in which the Supreme Court of Georgia refers approvingly to the Water Services decision in *dicta.*

22. Restatement, Torts § 757, *Comment b* (1939).

23. For a comparison between patent, trademark and trade secret protection see Doer-

fer, The Limits on Trade Secret Law Imposed by Federal Patent and Anti-Trust Supremacy, 80 Harv.L.Rev. 1432, 1447–56 (1967).

In *Water Services, supra,* we upheld Georgia's power to protect trade secrets in the limited fashion the Restatement, Torts § 757 provided. The Supreme Court has recently settled this question, holding that federal patent supremacy does not preempt state trade secret protection. Kewanee Oil Corp. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

24. "The argument of appellee that the improvement disclosed in the patent under consideration was without value, or of only nominal value, was rightly rejected. The appellee, by infringing use, has paid tribute to the utility of the device infringed." Enterprise Manufacturing Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir. 1944).

trial to challenge its uniqueness, they do not appeal the finding of the jury that AIMES III was a trade secret within the meaning of the § 757. Certainly it was undisputed that UCC viewed the system as a valuable and unique property, and used great caution in attempting to preserve its confidentiality. LYCSC itself described the system to one potential customer as ". . . the finest automated merchandising system available today," and proceeded to offer it to that customer for $45,000. Evidence was adduced at trial that AIMES III had unique capabilities and features which make it a valuable competitive product.[25] The jury could properly find that the AIMES III computer system owned by UCC was a trade secret. The jury further could find that LYCSC's appropriation of the system was unlawful and a knowing violation of Leonard's restrictive use agreement with UCC. The requirements for liability under § 757 were satisfied in this case.

Once having determined that the jury finding that AIMES III was a trade secret wrongfully appropriated by the defendants was proper, the problem remains as to what is the appropriate measure of damages. It seems generally accepted that "the proper measure of damages in the case of a trade secret appropriation is to be determined by refer-

ence to the analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine the damages for copyright infringement." International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696, 699 (3d Cir. 1957). The case law is thus plentiful, but the standard for measuring damages which emerges is very flexible.

In some instances courts have attempted to measure the loss suffered by the plaintiff. While as a conceptual matter this seems to be a proper approach, in most cases the defendant has utilized the secret to his advantage with no obvious effect on the plaintiff save for the relative differences in their subsequent competitive positions. Largely as a result of this practical dilemma, normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret. The most obvious way this is done is through publication, so that no secret remains.[26] Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication [27] the total value of the secret to the plaintiff is an inappropriate measure.

---

25. We note that we have held that novelty is not a requirement of a trade secret under Georgia law. *See Water Services, supra,* 410 F.2d at 172–173. This follows the majority rule of the Restatement, Torts, § 759, *Comment b* (1939). While a trade secret need not meet the standards of novelty required of a patented process, the secret must be something other than common knowledge. Cataphote Corp. v. Hudson, 444 F.2d 1313 (5th Cir. 1971); Clark v. Bunker, 453 F.2d 1006 (9th Cir. 1972). *See generally* 2 Callmann, Unfair Competition, Trademarks and Monopolies, § 52.1 (3d Cr. 1968).

26. *See, e.g.,* Precision Plating v. Martin Marietta, 435 F.2d 1262 (5th Cir. 1970), cert. denied, 404 U.S. 1002, 92 S.Ct. 571, 30 L. Ed.2d 556 (1971) where public disclosure of a process was held to constitute a complete destruction of the value of the trade secret.

27. Defendants disclosed the complete system to one Hugh Cort of Technical Resources, Inc., unaware that Cort had been retained by UCC to discover whether LYCSC had in fact stolen the AIMES system. Cort had pledged to retain that information he discovered in confidence. Thus while the defendants' disclosure of the system to him in our view constitutes a "use" of the system, see discussion p. 541, *infra,* this use did not amount to a form of public disclosure which destroyed the value of the secret to the plaintiff. *See* Servo Corp. v. General Electric Co., 393 F.2d 551 (4th Cir. 1968) which thoroughly discusses the elements of disclosure in a trade secrets context. *See also* Tilghman v. Proctor, 125 U.S. 136, 146, 8 S. Ct. 894, 31 L.Ed. 664 (1888); In re Cawood Patent, 94 U.S. 695, 24 L.Ed. 238 (1877); Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1939).

■ Further, unless some specific injury to the plaintiff can be established —such as lost sales—the loss to the plaintiff is not a particularly helpful approach in assessing damages.

[23] The second approach is to measure the value of the secret to the defendant. This is usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury. In the case before us, then, the "appropriate measure of damages, by analogy to patent infringement, is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret." International Industries, Inc. v. Warren Petroleum, *supra*, 248 F.2d at 699. The cases reveal, however, many variations in the way this benefit to the defendant can be measured.

■ Normally only the defendant's actual profits can be used as a measure of damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1939). Had the defendants here been able to sell the AIMES III system at a profit, our task would be simplified.[28] Because the defendants failed in their marketing efforts, no actual profits exist by which to value the worth to the defendants of what they misappropriated. However, the Supreme Court has held in a patent case that the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained in the mistaken belief their theft would benefit them. In re Cawood Patent, 94 U.S. 695, 24 L.Ed. 238 (1877).[29]

■ The rationale for this seems clearly to be that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves. Accordingly the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to a commercial use.[30]

This second technique frequently entails using what is called the "reasonable royalty" standard: while the parties to this action agree this is the appropriate standard, they are unable to agree on what the measure entails. Originally this measure was intended to deal with the situation where the misappropriated idea is used either to improve the defendant's manufacturing process, or is used as part of a larger manufactured product. In the early case of Egry Register Co. v. Standard Register Co., 23 F.2d 438 (6th Cir. 1928), a patent in-

28. *See, e. g.*, Westinghouse Electric and Manufacturing Co. v. Wagner Electric and Manufacturing Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222 where the Court put the burden of proving factors other than the infringed patent caused the profits on the infringer once the plaintiff patentee proved profits were made. *See also* Carter Products, Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383 (D.Md.1963) which awarded plaintiff the profits defendant made by using one of plaintiff's trade secrets.

29. Defendant's actual profits are now usually only one of a number of elements which can be considered in measuring damages for patent infringement. *See, e. g.*, Activated Sludge v. Sanitary District of Chicago, 64 F.Supp. 25 (N.D.Ill.1946), aff'd Per Curiam 157 F.2d 517 (7th Cir. 1946), cert. denied,

330 U.S. 834, 67 S.Ct. 970, 91 L.Ed. 1281 (1947) where the Court found no actual profits gained by the defendant, yet concluded "[t]he law is not impotent in attempting precise valuation, even though no market value exists and no loss or impairment of sales can be proven." 64 F.Supp. at 27. *See generally* Note, Recovery in Patent Infringement Suits, 60 Colum.L.Rev. 840, 849–852 (1960); Note, The Enforcement of Rights Against Patent Infringers, 72 Harv.L.Rev. 328, 345–348 (1958).

30. Official Airlines Schedule Information Service, Inc. v. Eastern Airlines, Inc., 333 F.2d 672, 674 (5th Cir. 1964) held that one requirement for recovery for misappropriation of an idea is that the "idea must be adopted and made use of by the defendant."

fringement case, the defendant manufactured and sold cash registers which in part used a device developed by the plaintiff to roll paper through the machine. The trial court had awarded the plaintiff the total profits the defendant had made on all sales of the machines using this device. The Sixth Circuit Court of Appeals held this measure of damages was inequitable, because the device was only a part of the larger product sold by the defendant. Because no actual apportionment of profits based on what percentage of the success of the marketing of the machines was due to the plaintiff's device could be shown, the court held the proper measure of damages would be a reasonable royalty on defendant's sales, thereby creating an apportionment of profits based on an approximation of the actual value of the infringed device to the defendant.

The Court explained its new measure in this way:

> "To adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and then to determine what the license price should have been. In effect, the court assumes the existence *ab initio* of, and declares the equitable terms of, a supposititious license, and does this *nunc pro tunc;* it creates and applies retrospectively a compulsory license. . . ."

The Court further held the proper standard would be a willing buyer-willing seller test: " . . . the primary inquiry . . . is what the parties would have agreed upon, if both were reasonably trying to reach agreement." *Egry Register, supra,* at 443.

■■ The language of the *Egry* decision has been often quoted, but the type of measure used by the Court, based on actual sales, has taken many different forms.[31] As the term is presently understood, the "reasonable royalty" measure of damages is taken to mean more than simply a percentage of actual profits. The measure now, very simply, means "[t]he actual value of what has been appropriated." Vitro Corporation of America v. Hall Chemical Co., 292 F. 2d 678, 683 (6th Cir. 1961). When this is not subject to exact measurement, a reasonable estimate of value is used. Many different factors are now considered in arriving at the "reasonable royalty" in any given case:

> "As pointed out in many cases . . . in a case where no established royalty is shown it is for the Court to determine a reasonable royalty which represents the value of that which has been wrongfully taken by the infringer . . . it is sufficient to point out that in making such determination many factors were taken into consideration . . .. In fact, the reasonable royalty was based upon the advantages which would have

---

31. 35 U.S.C. § 284 (1974) presently provides:

"Upon finding for the claimant the court should award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . "

The defendants attempt to define reasonable royalty as "a share of the profits on the product received by the owner for permitting another to use property" citing Patterson v. Texas Co., 131 F.2d 998, 1001 (5th Cir. 1942), cert. denied, 319 U.S. 761, 63 S. Ct. 1318, 87 L.Ed. 1712 (1943). Brief for Appellants, p. 21, n. 1. As should be clear from our discussion of the development of the "reasonable royalty" measure in the law

of ideas, and the gloss placed on this term as it is used in the cases, this standard commercial definition of the word "royalty" has no meaning in measuring damages for misappropriation of a trade secret.

As presently understood in patent law, a reasonable royalty is simply that amount which the trier of facts estimates a person desiring to use a patent right would be willing to pay for its use and a patent owner desiring to license the patent would be willing to accept. *See generally,* Note, Recovery in Patent Infringement Suits, 60 Colum.L. Rev. 840, 848–49 (1960) ; Fink, The New Measure of Damages in Patent Cases, 29 J. Pat.Off.Soc'y 822 (1947) ; Wolff, The Measure of Damages in Patent Infringement Actions, 28 J.Pat.Off.Soc'y 877 (1946).

accrued to (the infringer) had it negotiated a license . . . "

Union Carbide Corp. v. Graver Tank and Manufacturing Co., 282 F.2d 653, 674–675 (7th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961).

One other important variation on this "reasonable royalty" standard is the standard of comparison method, which also attempts to measure the value to the defendant of what he appropriated. As the Court in International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696, 699 (3d Cir. 1957) explained this method, relating it to the facts of the case in which the defendant had misappropriated a method of converting dry cargo vessels into ones equipped to transport liquefied petroleum gas, and had actually used the technique to convert one vessel:

> "This method contemplates the comparison of the cost of transportation by means of the use of the trade secret with a method of accomplishing the same result which would have been open to defendant had he not appropriated the trade secret."

▇ Occasionally this has been taken to mean the difference in costs to the defendant of developing the trade secret on his own, using the actual development costs of the plaintiff as the complete measure of damages. Servo Corp. v. General Electric Co., 342 F.2d 993 (4th Cir. 1965), cert. denied, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). This measure of damages simply uses the plaintiff's actual costs, and in our view is frequently inadequate in that it fails to take into account the commercial context in which the misappropriation occurred.

▇ In certain cases, where the trade secret was used by the defendant in a limited number of situations, where the plaintiff was not in direct competition with the defendant, where the development of the secret did not require substantial improvements in existing trade practices but rather merely refined the existing practices, and where the defendant's use of the plaintiff's trade secret has ceased, such a limited measure might be appropriate. In the type of case which we now consider, when the parties were potentially in direct competition and the course of conduct of the defendant extended over a period of time and included a number of different uses of the plaintiff's trade secret, and where the process of developing a computer system was very difficult and required substantial technical and theoretical advances, we believe a broader measure of damages is needed.

This broader measure should take into consideration development costs, but as only one of a number of different factors. We believe this type of measure is appropriate despite the fact that the inclusion of other factors means the final damage figure "need not be as precise as if the actual development costs for the trade secret were itself the measure of damages." Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 628 (7th Cir. 1971).

▇ Our review of the caselaw leads us to the conclusion that every case requires a flexible and imaginative approach to the problem of damages. We agree with the Court of Appeals for the Sixth Circuit that "each case is controlled by its own peculiar facts and circumstances," Enterprise Manufacturing Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir. 1944), and accordingly we believe that the cases reveal that most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation. Naturally in some cases the damages will be subject to exact measurement, either because the parties had previously agreed on a licensing price as in Vitro Corp. v. Hall Chemical Co., *supra,* or because some industry

standard provides a clear measure.[32] Where the damages are uncertain, however, we do not feel that that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.

 Certain standards do emerge from the cases. The defendant must have actually put the trade secret to some commercial use. The law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion.[33] If the defendant enjoyed actual profits, a type of restitutionary remedy can be afforded the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success. Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.

 In calculating what a fair licensing price would have been had the parties agreed, the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the

particular case which might have affected the parties' agreement, such as the ready availability of alternative processes. Hughes Tool Co. v. G. W. Murphy Industries, Inc., 491 F.2d 923, 931 (5th Cir. 1973).

### B. Challenges to Jury Instructions on Measuring Damages.

 The district court charged the jury that the following factors should be considered by them in arriving at the proper damages for the defendants' misappropriation of AIMES III: (1) the development costs incurred by the plaintiff; (2) the fees paid by customers of the plaintiff who utilized the system on a service bureau basis; (3) the prices at which the system was leased or sold by the plaintiff for restrictive use; (4) the sale price placed on the system by the defendants; and (5) expert testimony as to what would constitute a reasonable royalty for the rights to unrestricted use of the system. We believe that these factors were proper to be considered by the jury.

 The defendants challenge the trial court's charging the jury that they were to find the "reasonable value" of the computer system, arguing that the phrase "reasonable value" is an improper measure of damages, and that the proper measure can only be "reasonable royalty." In our view, the trial court's charge was proper. Naturally we read the charge in its entirety, and we do not believe that the trial court's charge in any way confused the jury as to what damages they were entitled to find. Defendants argue that the word "value" necessarily means the *entire* value of the system, or, in other words, the value of the system *to the plaintiff*, a measure they argue is appropriate only in cases where the secret has been totally destroyed. We believe the meaningful

32. *See, e. g.,* Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383 (D.Md. 1963) where evidence of other royalty rates for use of other of plaintiff's patented processes was held to have been properly considered by the Master, but did not amount to evidence of an established industry royalty.

33. *See* Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888, 947–48 (1964).

question is not whether the word "value" was used, but whether the jury was properly charged, as they were here, that they could assess damages only for the actual use of the AIMES III system in an amount which would fairly approximate the price the parties would have come to, had the defendant been licensed to use the system as it did.

The court properly concluded its instructions on Count 3 by charging the jury:

"[i]f you should further determine that (the plaintiff, UCC) has sustained any damages, it will be your responsibility to determine from all the evidence in the case what amount would be paid as a reasonable royalty for the unrestricted use of said computer program by a buyer willing, but not compelled to buy, to a seller willing, but not compelled, to sell."

This was an accurate statement of the law.

### C. Challenges to Jury's Finding Defendants Put AIMES III to a Commercial Use.

The defendants' position is quite simply that there was no evidence they ever "used" the system, as required by the law on misappropriation of trade secrets, and that accordingly the trial court erred in denying their motion for a directed verdict on Count 3. The defendants place considerable emphasis on the fact that, in their view, the plaintiff lost nothing. They point to the plaintiff's failure to prove lost profits as grounds for dismissal of plaintiff's claim for damages. In our view the established rule is that the plaintiff is not required to prove lost profits; rather it need only prove misappropriation of its valuable trade secret and prove that it was put to some commercial use.

The defendants claim that their inability to market the AIMES III system should insulate them from liability. While the defendants may be tech-

nically liable to the plaintiff under the formulation of § 757 of the Restatement of Torts due to the way they obtained the AIMES III system, they argue damages can be assessed against them only for a limited percentage of actual profits. We reject this view.

While the cases use the term "reasonable royalty" to describe the method of calculating damages, we do not believe the word "royalty" has the talismanic quality the defendants ascribe to it. While in certain cases the reasonable royalty would be a percentage of profits on actual sales, we do not accept the view that this need be the measure in all cases.

Rather the measure should correspond to the nature of the use. In cases where the trade secret was used to improve manufacturing, and subsequently manufactured items were sold at a profit,[34] it would seem natural and equitable to measure damages based on those sales. But when, as here, the trade secret itself was what was to be sold—unlike any of the other cases we have discussed—we do not believe the same measure should apply.

Superficially the defendants' argument that they did not "use" the AIMES III system seems supported by the cases. Almost without exception prior trade secret cases involved a device or process which was used by the defendant to improve his manufacturing process. Either the idea was some new way to improve manufacturing, or some new device which improved a larger manufactured product. Obviously when a trade secret is "used" in such cases, the use is manifest and extensive. Here the use by the very nature of the misappropriated secret is more subtle. The computer system had value in that it could be sold to customers for their internal use, or it could be used by its owner on a service bureau basis if the owner chose to lease time on its computer to outside clients, and permitted the clients to use the programs. Fur-

---

34. *See, e. g.,* Egry Register Co. v. Standard Register Co., 23 F.2d 438 (6th Cir. 1928).

ther, the system had a value in that it represented a technical achievement, some new method of accomplishing the ordering of data to produce useful business reports. Testimony at trial indicated experts in the field of computer technology could be assisted in their experimental work by viewing the systems of others. Given these facts concerning the utility of the AIMES III system, in our view three separate sets of facts established a pattern of use of the system by the defendants which warrants damages for use of the system as if the defendants had been licensed to use it without restrictions.

Because of the earnestness with which this issue is argued by the parties, we feel it is necessary to discuss it in some detail.

■ First, it is clear that the defendants offered the system to potential buyers. They represented they held rights to the system which entitled them to sell the system to others. In some cases the defendants represented the system to be of their own design, designating the system under the initials MIMIC. In other cases the defendants acknowledged the UCC role in developing the system, but asserted rights to it. We believe this was a "use" which satisfied the requirements of the law on misappropriation of trade secrets.

■ Defendants claimed that computer service organizations frequently offered systems they did not own. Plaintiff's witnesses who had expertise in the field denied that this was true; defendants produced no examples of marketing campaigns of the type they conducted for systems the seller did not own. While it was shown that occasionally firms would sell systems they were in the process of developing (as indeed UCC had sold the AIMES III system to Leonard's before the research had been completed) clearly this is not the same thing as selling the system another owned. The only other instance of the marketing campaign preceding the sell-

er's obtaining rights to the system was when the owner of the system had explicitly solicited such a campaign. We further believe the jury could find that LYCSC was attempting to sell a system it believed it had in its possession (i. e., the system it had misappropriated) rather than a system it believed it could purchase from UCC. The relations between UCC and the LYC subsidiary grew progressively more strained following what the jury found to have been LYC's breach of the joint venture agreement in October, 1969. The jury could reasonably infer that UCC was unwilling to deal with LYCSC and that LYCSC had no reason to believe that it would be able to purchase a copy of the AIMES III system from UCC after December, 1969; the defendants offered no evidence that they attempted to revive negotiations for purchases of software from UCC during 1970, despite the fact their marketing efforts continued unabated.

Finally, we find it difficult to ignore the fact that in February, months after all negotiations for the purchase of AIMES III ceased, LYCSC was still anxious to obtain the entire system and used Ron Clinton to obtain additional tapes and materials. We accept the jury's finding that LYCSC intended to sell the system it had misappropriated.

■ While defendants presented testimony at trial attempting to show that LYCSC arranged to steal the system only to guarantee that upon later purchasing the system from UCC they could be assured they received a current copy of the system, this testimony was thoroughly discredited by the fact that undisputed evidence at trial proved that the negotiations with UCC over the purchase of AIMES III ended prior to January, 1970, and that despite this fact LYCSC obtained additional AIMES III materials from Clinton in February, subsequently ran the system in their computer in February, compiled a complete Cobol listing for the system, and continued to offer the system to poten-

tial customers until April, 1970. The jury could reasonably reject this defense.

■ Once having determined this, it seems clear that any misappropriation, followed by an exercise of control and dominion such as an attempted sale (in which lay the principal value the system held for LYCSC), must constitute a commercial use for which damages can be awarded.

■ Second, LYCSC displayed the component programs and listings of AIMES III to Hugh Cort of Technical Resources, Inc. Once again such conduct indicates a continuing use in that the defendants viewed the system as something they could handle as they wished, without regard to the interest they knew UCC had in maintaining its confidentiality. The admitted secrets of AIMES III lie in its ability to generate specific reports and in its novel use of certain types of numbers placed on the inventory items (the so-called AIMES numbers) which are used to accomplish the compilation of inventory data. There is evidence in the record which indicates that any expert in computer software who observes the Cobol listings, the reports generated, and the details of the programs of a system of a competitor will gain a commercial advantage from that information. LYCSC thus took upon itself the authority to display all this information to such an expert, knowing that he could potentially use that information to the competitive disadvantage of UCC. We view this as a clear commercial use of the system—but one which has a second facet as well.

LYCSC displayed the various reports, listings and programs described above in the hopes of interesting Technical Resources in jointly developing a type of control system called RANFILE which they believed Technical Resources to be developing. AIMES III thus served the commercial interests of LYCSC and the other defendants in that it was used to prove LYCSC's technical expertise inasmuch as the AIMES III system was rep-resented as being of LYCSC's design and invention.

■ Finally, there is some evidence that LYCSC had installed the AIMES III system on a service bureau basis. What this would mean is that LYCSC would be equipped to lease time on its in-house equipment and its clients could use the AIMES III system. The evidence of this is indirect, the unobjected to hearsay account of one Herbert Martenson who told of a LYCSC's salesman's claim that this was true. There was, further, clear and undisputed testimony that LYCSC had run the entire system to generate a complete set of Cobol listings after Clinton had delivered the additional tapes to LYCSC in February, 1970. We believe there is evidence from which the jury could reasonably infer that LYCSC had used the system on its computer, and that this constituted a commercial use.

■ Taken together, these three patterns of usage lead us to the conclusion that the jury could, indeed, find that LYCSC and, through it, the other two defendants, used the AIMES III system as if it had been theirs to do with as they pleased. They ran the tapes, they compiled the listings, they generated several reports, they exposed the secrets of the system to a competitor. In short, they acted as if they owned unrestricted rights to the system. No other pattern of licensing was shown by the defendants which would permit them the complete freedom they had in using the system as they chose. The defendants offered no evidence that under past industry practice the type of agreement the parties would most likely have reached would be some form of royalty on sales, thereby sanctioning this type of unrestricted use by the fictional licensee. We are unprepared to hold that because UCC had in the past refused to sell its rights to the AIMES III system to a competitor, and thus was unable to show past transactions to show how an agreement of this sort would have been reached, it should accordingly be denied damages.

■ In our view it is precisely in cases where the plaintiff had previously attempted to maintain the complete confidentiality of its trade secret that the lack of evidence of prior industry practice should not unreasonably limit the plaintiff's ability to prove its damages.

### D. *Challenges to Admission of Evidence on Value of AIMES III*

The defendants challenge the method by which UCC proved damages at trial. The only evidence introduced by either side on the question of damages for the AIMES III misappropriation was the expert testimony of one Stan Josephson, who estimated the value of a sale of unrestricted rights to AIMES III at $220,000. Defendants challenge both the expert qualifications of this witness and the legal sufficiency of his testimony. We deal with the first of these issues quickly.

■ The trial court has substantial discretion over the admission of evidence, Reuter v. Eastern Air Lines, 226 F.2d 443 (5th Cir. 1955) and this includes the admission of expert testimony. Salem v. U. S. Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). In the absence of obvious error we will not disturb the ruling of the trial court. We find no error in permitting Josephson to testify as an expert. He was UCC Vice President of Technical Services. He testified he was responsible for developing software systems, pricing them for marketing, and then assisting as technical expert at sales presentations. He testified in pricing a software system he took into account such factors as development costs, the long-term potential for the system and UCC's sales objectives, as well as such extrinsic factors as the current market for such systems. We find Josephson was properly permitted to testify as to the value placed on the sale of unrestricted rights to the AIMES III system by UCC.

■ The second challenge to Josephson's testimony involves this colloquy from the record during Josephson's cross-examination:

Q: Now, of course, you understand Mr. Josephson, I take it, that value—when you give an opinion on value, you are talking about what someone is willing to pay. Is that correct?

A: Oh, I wouldn't categorize it as that narrow.

Q: You wouldn't?

A: No. Value I don't think is what someone else will pay.

Q: What—

A: As you stated, I don't believe that value is strictly what someone else is willing to pay.

Q: Well, when you are talking about value here what were you talking about?

A: I'm talking about many things, the value of that particular product, the use that a retail company or data processing firm can make of that product. Many things besides—inherent in value.

Q: Then you were not telling us, arriving at a price at which the willing buyer would buy from a willing seller, that price they would arrive at?

A: What I was telling you, as I testified, was the generally accepted practice within the computer industry for unrestricted use of a valuable computer program.

Q: And that's not what a willing seller and a willing buyer would arrive at as a consequence of a negotiated transaction?

A: No. They're two separate things.

Defendants rightly point to the ambiguity created by Josephson's concession that what he was calculating was something other than what a willing buyer would agree to, which is the proper measure of damages.

In part our decision to sustain the jury verdict, which was heavily depend-

ent on the Josephson testimony in view of the fact they assessed damages of $220,000, the precise estimate he had testified to, is based on our view that the jury was properly instructed in the law governing damages. The verdict of a jury properly instructed in the law clearly resolves ambiguities of this sort in testimony, and the jury had been fully instructed in the willing buyer-willing seller test.

But secondly we believe the ambiguity created by cross-examination was more apparent than real. Naturally, we read Mr. Josephson's testimony in its entirety and we do not find the above-quoted passage so inconsistent with his otherwise legally accurate description of how to calculate the value of unrestricted rights to AIMES III as to justify the jury verdict based on that testimony. Certainly estimating sales price as a function of costs is unexceptionable, and Josephson in our view had the expertise to opine that the proper way to calculate value is to multiply costs by a multiple of 2½.

What the disputed passage amounts to is Josephson's reluctance to claim that the figure he set as the proper sale price was necessarily that which a buyer would agree to. We can understand why he would demur from confidently asserting this is what the parties would agree to, for he had no prior transaction upon which to base his opinion. We believe it wasn't improper for UCC to prove its best estimate of the proper sales price, in part taking into consideration its policy of normally not offering its systems to potential competitors. While a certain amount of speculation is involved in this highly theoretical reconstruction of a sale which never took place, the aggrieved plaintiff must be permitted to present its best evidence on damages and not be foreclosed from seeking damages it deserves due to difficulty in measurement.

While we do not dispute the proper standard to be the "willing buyer-willing seller" test, we do not think a reconstruction of the agreement these two reasonable parties would arrive at can be taken too far. Nor do we feel that a witness as to value must cast his answers in the precise language that the Court uses in charging the jury. Both sides in such a hypothetical transaction have interests they wish to protect; such interests affect the price at which they are prepared to buy or sell—and in cases such as this one, the law is far more concerned with the rights and interests of the aggrieved plaintiff than in the interests of the defendants which they would have tried to protect had they dealt openly with the plaintiff from the beginning. As the Court in the *Egry Register* case acknowledged, the hypothetical agreement "must be modified by the commercial situation" *supra*, 23 F.2d at 443, and where the "willing seller" would have been unwilling to sell but for the theft of his secret, the Court reconstructing the agreement should consider the reasons the seller is unprepared to sell, and take into account such factors as the possible decline in the seller's future competitive posture.

This interest the holder of a trade secret has in retaining his rights to his secret is not a trivial one, and one which we do not intend to minimize. Courts should be reluctant to penalize an aggrieved plaintiff by too unrealistic and sterile a requirement of proving that the defendant *would* have agreed to the price the plaintiff thinks is fair. As in Forest Laboratories, Inc. v. Formulations, Inc., 320 F.Supp. 211, 213 (E.D. Wis.1970), affirmed in part, reversed in part on other grounds, 452 F.2d 621 (7th Cir. 1971) where the president of the plaintiff company was permitted to testify as to what price would have been required for the plaintiff to willingly agree to sell its patented secret, we believe a consideration of plaintiff's interest in protecting its future competitive position is proper, and some consideration must be given to the price at which the seller would be "willing" to deal. In affirming the trial court's assessment of damages in the *Forest Laboratories*

case, the Seventh Circuit expressly acknowledged that consideration of such factors as plaintiff's future ability to stay in business is proper. 452 F.2d at 627–628. We fully agree with this approach.

■ The proper method of fleshing out the dimensions of this hypothetical sale is by cross-examination and rebuttal testimony. The plaintiff fulfills its burden of proving damages by showing the misappropriation, the subsequent commercial use, and introduces evidence by which the jury can value the rights the defendant has obtained. This UCC did; the defendants introduced no evidence on the question of the value of unrestricted rights to AIMES III. The defendants chose to leave Josephson's testimony unchallenged as to how his estimate of value was arrived at, save for their belief his admission he couldn't guarantee a willing buyer would accept the $220,000 figure necessarily destroyed the value of all his testimony.

■ Because we read the record as presenting a valid issue of damages to the jury, with sufficient evidence by the plaintiff to permit the jury to value the system at $220,000, we cannot now decide that the $220,000 verdict was clearly excessive as defendants argue.

■ The defendants also attack the basis for Josephson's calculation of total development cost—claiming such factors as marketing expenses and the plaintiff's royalty agreement with the original developer of the system should not have been included as development costs. We believe these were questions for the jury; the defendants did not choose to cross-examine Josephson extensively on

this point, nor did they present rebuttal evidence to dispute his inclusion of these amounts. The jury was not obliged to accept Josephson's figures, but we hold they could reasonably do so.

■ The defendants next argue that permitting Josephson to testify as to the unaccepted offer UCC made to Honeywell for the sale of rights to unrestricted use of the AIMES III system was manifest error requiring reversal. It is clear that as a general rule, unaccepted offers are improper evidence by which to estimate value.[35] Typically this problem will arise in condemnation proceedings where an expert witness estimates value by using sales of adjoining property, and occasionally uses unexercised options to purchase adjoining property.[36] A second frequent problem occurs when the owner of the condemned property attempts to use past offers he has received to prove the value of the property.[37]

The clearest statement of the rationale for excluding this evidence appears in Sharp v. United States, 191 U.S. 341, 348–349, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903):

"It is, at most, a species of indirect evidence of the opinion of the person making such offer as to the value of the land. He may have so slight a knowledge on the subject as to render his opinion of no value, and inadmissible for that reason. He may have wanted the land for some particular purpose disconnected from its value. Pure speculation may have induced it, a willingness to take chances that some new use of the land might, in the end, prove profitable. There is no opportunity to cross-examine the per-

35. Liflans Corp. v. United States, 390 F.2d 965, 182 Ct.Cl. 825 (1968); Jayson v. United States, 294 F.2d 808 (5th Cir. 1961); Bank of Edenton v. United States, 152 F.2d 251 (4th Cir. 1945); United States v. Dillman, 146 F.2d 572 (5th Cir. 1944), cert. denied, 325 U.S. 870, 65 S.Ct. 1409, 89 L.Ed. 1989 (1945); Atlantic Coast Line R. Co. v. United States, 132 F.2d 959 (5th Cir. 1943); Clarke v. Hot Springs Electric Light and Power Co., 55 F.2d 612 (10th Cir. 1932), cert. denied, 287 U.S. 619, 53 S.Ct. 19, 77

L.Ed. 537 (1932); Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903).

36. See, e. g., United States v. Smith, 355 F. 2d 807 (5th Cir. 1966); United States v. Certain Land in the City of Fort Worth, 414 F.2d 1029 (5th Cir. 1969).

37. See, e. g., St. Joe Paper Co. v. United States, 155 F.2d 93 (5th Cir. 1946); United States v. Playa De Flor Land and Improvement Co., 160 F.2d 131 (5th Cir. 1947).

son making the offer, to show these various facts. Again, it is of a nature entirely too uncertain, shadowy, and speculative to form any solid foundation for determining the value of the land . . . .."

In virtually every case which has utilized this general rule, the offers came from third parties, frequently unidentified, and were mere hearsay. Further, in most of these cases there was no evidence that the offeror had the type of expert qualifications which would have entitled him to testify as to his opinion on value had he been called at trial.

■ Thus, while the rule is well entrenched in the caselaw, it is designed to serve specific purposes and we do not believe is meant to be enforced mechanically or without regard to the reasons for its existence. In the past where the offer was part of a continuing series of negotiations leading to ultimate agreement, it was held to be admissible.[38] Where the offer was introduced for a purpose other than to prove value, it was held to be admissible.[39] Where the offer was such a trivial part of the evidence offered as to be harmless, this Court has recognized the rule of Sharp v. United States is not to be automatically applied.[40]

■■ In sum, we find the admission of testimony concerning UCC's past offer to Honeywell of unrestricted rights to the AIMES III system of $220,000 to have been properly admitted. The past offer wasn't hearsay, for Josephson had personally been involved in the Honeywell transaction. Josephson was an expert and the rule against admitting proof of anonymous offers from unqualified third parties is clearly inapplicable to the facts of this case. Finally the figure of $220,000 was subject to full cross-examination. The defendants could explore with Josephson what fac-

tors he considered, what factors he ignored, how development costs were calculated, and finally how he arrived at the multiple of 2½ times development costs. We conclude they suffered no prejudice from the admission of evidence on the Honeywell offer.

■ There is a second, equally compelling, reason to uphold the admission of the evidence. The issue of the Honeywell offer was first raised on cross-examination of Josephson by the defendants. Josephson was asked whether UCC had ever offered unrestricted rights to anyone in the past, but was not asked what the offer actually was. We believe in the interests of elementary fairness the plaintiff had the right to then complete the account of the transaction which the defendants began. Had the jury only heard that an offer had been made to Honeywell, but did not learn of the amount, their likely reaction would be that UCC was concealing the facts of the Honeywell transaction because they had offered the AIMES III system for substantially less than $220,000. This untrue inference was properly rebutted.

E. *Challenge to Trial Court's Resubmission of the Case to the Jury.*

Finally the defendants challenge the verdict of $172,000 as not being the jury's true verdict. Originally the jury returned verdicts of punitive damages alone on Counts 3 and 4, the misappropriation and conversion counts relating to the theft of the AIMES III system. This ignored the trial court's explicit instruction that punitive damages could only be awarded if actual damages were also assessed. The defendants argue that this initial verdict amounted to a finding that plaintiff suffered no actual injury and judgment should accordingly have been entered for defendants on Counts 3 and 4.

38. Sammons v. United States, 433 F.2d 728 (5th Cir. 1970), cert. denied, 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971).

39. Liflans Corp. v. United States, 390 F.2d 965, 182 Ct.Cl. 825 (1968).

40. United States v. Certain Land in the City of Fort Worth, 414 F.2d 1029 (5th Cir. 1969).

The trial court, upon receiving this first verdict, informed the jury its verdict was not in proper form and that they should retire to correct it.

The court next informed counsel what had occurred, and discussed with them how to handle the situation. The court correctly observed the verdicts for punitive damages either meant the jury found no actual damages, or they were confused on his initial instructions as to how to assess damages. Naturally defendants immediately moved for entry of judgment, but their motion was denied. The court decided to bring the jury back and charge them again on damages. He told them again what factors were to be considered in measuring actual damages; he told them punitive damages could only be awarded in conjunction with actual damages. Finally he charged the jury:

"Now, I want to make it abundantly clear to you that if it was your intention, ladies and gentlemen, if you determined—if you have already determined that the plaintiff is not actually damaged with respect to Counts three and four, that will end your deliberations, and all you have to do in that event is return a verdict for the defendants."

We believe the trial court had the authority to request the jury to correct its verdict. While the problem has arisen infrequently, several courts have held a trial court may order a jury to continue its deliberation if the verdict is contrary to the court's instructions. Alston v. West, 340 F.2d 856 (7th Cir. 1965); Grober v. Capital Transit Co., 119 F.Supp. 100 (D.D.C.1954).[41] Similarly if the jury returns two inconsistent verdicts, the trial court may resubmit the issue to them for clarification. Wells Truckways, Ltd. v. Burch, 247 F. 2d 194 (10th Cir. 1957).[42]

Naturally the court may not coerce the jury, nor should it attempt to change the jury's findings—but that was not done in this case. That portion of the trial court's new instructions to the jury which we quoted earlier seems to clearly and properly notify the jury of its options without making any attempt to sway the jury in its deliberations. We find the trial court properly recharged the jury, and properly resubmitted their verdict to them to clarify their decision. We approve the clear instructions to the jury that if they had decided the plaintiff suffered no actual injury they were to find for the defendants as a valid effort to guarantee the jury understood they were to reconsider their verdict only in the event they had misunderstood the court's instructions originally.[43]

---

41. We note by analogy the Georgia practice of returning verdicts for further consideration if the verdict is confused, contrary to law or contrary to the judge's instructions. Piedmont Cotton Mills, Inc. v. General Warehouse No. Two, 222 Ga. 164, 149. S.E. 2d 72 (1966); Lowery v. Morton, 200 Ga. 227, 36 S.E.2d 661 (1946).

42. We believe practice under Rule 49(b) of the Fed.R.Civ.P. is analogous. Where a general verdict is accompanied by inconsistent answers to special interrogatories, the rule provides "judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." The practice of resubmitting verdicts to a jury for further consideration has been consistently upheld. See, e. g., Nordmann v. National Hotel Co., 425 F.2d 1103 (5 Cir. 1970); Epstein v. Dennison Mfg. Co., 314 F.Supp. 116 (S.D. N.Y.1969). See generally 5A Moore's Fed-

eral Practice ¶ 49.04, Wright & Miller § 2513.

43. The court polled the jury after they returned their second verdict as to whether they intended by their first verdict to find no actual injury had been suffered by plaintiff. Each juror responded in the negative. The defendants subsequently have obtained affidavits of two jurors which contradict their statements in open court and claim the first verdict did express the jury's finding of no actual injury. We believe such affidavits are an improper effort to impeach a jury verdict after it has been delivered. It is improper to interrogate a juror concerning what he meant by his verdict. Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U. S.App.D.C. 192, 126 F.2d 224 (1942). An affidavit of a juror is admissible to s'ow that the verdict delivered was not that actually agreed upon. See Fox v. United States, 417 F.2d 84 (5th Cir. 1969) but a juror may not

## IV. BREACH OF OLIVER SHINN'S NON–COMPETITION AGREEMENT WITH UCC.

UCC cross-appeals on entry of judgment on the jury verdict against it on Count 6.[44] We conclude that plaintiff is foreclosed from appeal on this issue by its failure to test the sufficiency of the evidence after the verdict by motion for judgment n. o. v. This Court does not weigh the sufficiency of the evidence as if on a motion for a new trial —for this function is within the discretion of the trial court. Rather, our function normally would be to evaluate the sufficiency of the evidence to sustain the jury verdict.

Under Cone v. West Virginia Pulp and Paper Co., 330 U.S. 212, 67 S. Ct. 752, 91 L.Ed. 849 (1947), a Court of Appeals cannot order entry of judgment for a party whose motion for a directed verdict was erroneously denied unless the sufficiency of evidence is first tested by a motion for judgment n. o. v., which motion is proper only if the moving party had previously moved for a directed verdict at the close of evidence pursuant to F.R.Civ.P. 50(b).

Porter v. Eckert, 465 F.2d 1307 (5th Cir. 1972); Stockton v. Altman, 432 F.2d 946 (5th Cir. 1970) and Delchamps, Inc. v. Borkin, 429 F.2d 417 (5th Cir. 1970) are examples of recent applications of this rule by this Court. *See generally,* 5A Moore's Federal Prac-

tice 50.12 (2d Ed. 1966). Here, no such motion was made, and following these clear authorities, we are unable to review the sufficiency of the evidence on which the jury found against UCC on Count 6.

## V. ATTORNEY'S FEES.

Under Ga.Code Ann. § 20–1404, attorney's fees may be awarded "if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense . . . ." The bad faith referred to has been consistently held by Georgia courts to refer to the conduct of the defendant in his dealings with the plaintiff out of which the suit arose, rather than the defendant's conduct in defending the suit.[45]

The defendant LYC challenges the jury finding of bad faith in connection with Count 1. We find this to be without merit. There was sufficient evidence of secret meetings, confidential cost studies and the like, to permit the jury to find bad faith in LYC's dealings with UCC.

However, the Georgia courts have placed a gloss on the requirements of § 20–1404—adding to them the further requirement that in order for a plaintiff to be entitled to attorney's fees the jury must award the plaintiff substantially what he has requested in damages.[46]

---

subsequently impeach a verdict by stating how it was reached. Webb v. U. S. Lines Co., 266 F.2d 611 (2d Cir. 1959). *See generally* 6A Moore's Federal Practice ¶ 59.08 [4].

44. Plaintiff's cross-appeals involving Counts 4 and 7 are rendered moot by our affirmance of the jury verdict on Count 3, inasmuch as Counts 4 and 7 involved essentially the same damages under different theories of recovery. The plaintiff acknowledges in its brief that such an affirmance of Count 3 has this effect.

45. Adams v. Cowart, 224 Ga. 210, 160 S.E.2d 805 (1968); B-X Corp. v. Jeter, 210 Ga. 250, 78 S.E.2d 790 (1953); Trader's Ins. Co. v. Mann, 118 Ga. 381, 45 S.E. 426 (1903).

46. Georgia Farm Bureau Mutual Ins. Co. v. Boney, 113 Ga.App. 459, 148 S.E.2d 457 (1966); Broyles v. Johnson, 103 Ga.App. 102, 118 S.E.2d 734 (1961); Simonton Const. Co. v. Pope, 95 Ga.App. 211, 97 S.E. 2d 590 (1957), reversed on other grounds 213 Ga. 360, 99 S.E.2d 216 (1957); Crump v. Ojay Spread Co., 87 Ga.App. 250, 73 S.E.2d 331 (1952); Schafer Baking Co. v. Greenberg, 51 Ga.App. 324, 180 S.E. 499 (1935); Atlanta Life Ins. Co. v. Jackson, 34 Ga.App. 555, 130 S.E. 378 (1925); Love v. National Liberty Ins. Co., 157 Ga. 259, 121 S.E. 648 (1924); Queens Ins. Co. v. Peters, 10 Ga. App. 289, 73 S.E. 536 (1912); Southern Mutual Ins. Co. v. Turnley, 100 Ga. 296, 27 S.E. 975 (1895).

The plaintiff argues G. E. C. Corp. v. Levy, 126 Ga.App. 604, 191 S.E.2d 461 (1972) reverses this rule. We cannot agree with this reading of the case. In *Levy* the Georgia Court of Appeals specifically noted that "although the plaintiff did not recover all that he sought he did recover a substantial amount . . . ." 126 Ga.App. at 608, 191 S. E.2d at 465. We believe this was in keeping with the rule announced in the cases cited above.

 The plaintiff UCC did not recover substantially all that it sought in damages in Count 1. The amended complaint requested damages of three million dollars; the plaintiff put on proof of damages in excess of two million dollars at trial—yet recovered only $172,000. In our view this amount is so substantially less than the amount requested that the verdict for attorney's fees cannot stand, as it clearly amounts to a punitive measure which the Georgia cases expressly state § 20–1404 will not permit.

We cannot stop here, however, for we further find that the trial court erroneously charged the jury on assessing attorney's fees, and accordingly that issue must be retried.

The district court charged the jury:

If you should render a verdict for the plaintiff on any of the four counts or more than one of the four counts, and if you should further determine —and this, again, is a matter entirely for you—that the plaintiff is entitled to attorney's fees on any of those counts, then you should go ahead and make a finding as to attorney's fees on each of those counts.

In other words, don't split anything up; just go ahead and make a determination as to attorney's fees on each of these counts, and if you should return a verdict for the plaintiff on more than one count, I instruct you that the plaintiff would not be entitled to more than one award of attorney's fees, so that if you should return more than one award of attorney's fees, I will frame an appropriate

judgment and will award to the plaintiff by said judgment only one of the awards indicated in your verdict.

 We believe this instruction was erroneous. The jury was improperly denied the opportunity to apportion attorney's fees among the different counts and different defendants according to the proportion of total counsel time and effort which was devoted to each of the three substantive areas of the law suit, the joint venture breach, the AIMES III misappropriation and the violation of Shinn's non-competition agreement. The fact that the plaintiff's counsel refused to attempt to apportion his time in this manner, claiming the three were entwined, in no way concludes the matter. The jury heard the full case presented, and the jury would have known what percentage of the case was devoted to which substantive cause of action.

 The jury should have been instructed to assess each count separately —evaluating each under the standards set out in § 20–1404 to determine whether attorney's fees should be awarded, and then determining whether to award fees for each area. While the trial court properly was concerned lest the plaintiff receive three times the fees it had proven, we do not believe the proper method of handling this potential problem is to take the matter from the jury entirely.

It is to be particularly noted that not all defendants were joined in all the counts. By charging the jury as the trial court did, the court may well have induced the jury to deliver one verdict of attorney's fees, against only one defendant, for possibly the entire amount which the jury felt the plaintiff's counsel should receive for the case—despite the fact that the jury found against the plaintiff on the non-competition agreement count, and we now hold found damages in an inadequate amount under the joint venture agreement count to support an award of attorney's fees.

 We believe there was sufficient evidence in the record to sustain a jury finding of bad faith in the defendants'

misappropriation of AIMES III, and thus we believe the issue of attorney's fees must be remanded for a new trial. Naturally because we do not disturb the original jury's findings as to liability and damages, only the AIMES III count can be the basis for attorney's fees, and the jury should be so instructed. The damages the jury assessed on the AIMES III count are, we believe, sufficient to support an award of attorney's fees. In evaluating what proportion of counsel's services related to the AIMES III count, we believe it is proper to apportion counsel's efforts into the three substantive areas of the lawsuit, rather than by count. Thus the jury, if it wishes to award attorney's fees, should consider what proportion of counsel's time was devoted to the preparation of Counts 3, 4, 5 and 7, all of which relate to AIMES III, and it may properly award attorney's fees on Count 3 for the total time involved in preparing and trying the AIMES III claims.

The case is affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.